EVANS v HOLLOWAY SAND AND GRAVEL, INC

DIXON v HOLLOWAY SAND AND GRAVEL, INC

Docket Nos. 44008, 44009. Submitted February 3, 1981, at Lansing.—Decided May 5, 1981.

C. Merle Dixon and his wife, Alma Dixon, were the owners of approximately 126 acres of land in Washtenaw County. In 1973, the Dixons entered into a written agreement with Holloway Sand and Gravel, Inc., *authorizing Holloway to determine whether a commercial sand and gravel mining operation was feasible on the property* and, if so, granting Holloway the right to remove sand and gravel for a two year period commencing May 1, 1973. Several months after the first agreement was signed, the parties executed a second document entitled "Sales Agreement" which was dated retroactively to March 12, 1973, and which superseded the original agreement. Paragraph 2 of the new agreement stated:

"That, the Sellers [Dixons] *do hereby bargain and sell to the Purchaser* [Holloway, Inc.] *who agrees to pay for the same, on the terms and conditions hereinafter set forth, all sand, stone and gravel located in and on * * * the premises.*"

The Dixons were to be paid at a rate of ten cents per ton for all materials removed from the premises and the sales agreement contained the following provision for duration and renewal:

"This agreement shall be for a period of three (3) years from and after April 1, 1973. It may be renewed by Producer *[sic]* by giving notice of exercise of option to renew at least sixty days prior to its expiration, in writing."

Holloway was required to remove at least 50,000 tons of gravel per year or pay the sellers its equivalent value ($5,000). Holloway was permitted to stockpile up to 75,000 tons of material on the premises and was allowed to conduct mining

REFERENCES FOR POINTS IN HEADNOTES

[1] 25 Am Jur 2d, Easements and Licenses § 4.
[2] 25 Am Jur 2d, Easements and Licenses §§ 1, 2, 12, 13.
[3] 25 Am Jur 2d, Easements and Licenses § 124.
[4] 66 Am Jur 2d, Records and Recording Laws § 55.

operations on all but 26 acres of the property. Holloway started mining sand and gravel on the property pursuant to the sales agreement. In April of 1975, the Dixons retained an attorney, plaintiff William E. Evans, for estate planning purposes. Subsequently, the Dixons agreed to sell Evans the property. On December 3, 1975, Evans sent a letter to Holloway requesting negotiations regarding a new agreement between the Dixons and Holloway. Holloway sent a letter to the Dixons on January 22, 1976, advising them of intent to exercise its option to renew pursuant to the March 12, 1973, sales agreement. The pertinent part of the letter stated:

"As per our Sales Agreement dated the 12th day of March, 1973, for the period of three (3) years from and after April 1, 1973. Please take notice that we would like to exercise our option to renew our Sales Agreement for the removal of Sand and Gravel from your property located at 2170 S. Zeeb Road. Ann Arbor, Michigan.

"May we please hear from you as soon as you have the new agreement ready. Thank you for your kind consideration in the above matter."

On March 22, 1976, a warranty deed was executed whereby C. Merle Dixon conveyed the property to Evans and his wife. In a separate conveyance, Dixon was granted a life estate in the property. On April 15, 1976, Evans sent a letter to Holloway giving notice that he had purchased the property and that Holloway's presence on the property constituted a continuing trespass as of March 22, 1976. Holloway did not respond to this letter. On April 19, 1976, plaintiffs William and Katherine Evans filed suit in Washtenaw County Circuit Court against Holloway Sand and Gravel, Inc., and Daniel Holloway, seeking an *ex parte* restraining order to prevent defendants from continuing sand and gravel mining on the property. The complaint alleged that the sales agreement had not been renewed or was not binding on the Evanses. Defendants filed an answer and counterclaims on April 22, 1976, contending that the Evanses were guilty of tortious interference with contractual relations, fraudulent representation and conspiracy. Plaintiffs Evanses filed supplemental pleadings adding counts to their original complaint including misrepresentation, breach of agreement due to excessive stockpiling of sand and gravel, fraudulent accounting practices, and injury to their character and reputation due to false and malicious allegations in defendants' counterclaim. Defendants filed a motion for summary judgment, which was granted by the court, Ross W. Campbell, J., on July 26, 1976. In its opinion, the court found that the

sales agreement created an easement or *profit a prendre* binding on the Evanses and also concluded that Holloway effectively exercised the option to renew the agreement. The Court of Appeals reversed in an unpublished per curiam opinion, Docket No. 29777, released November 10, 1976. The case was remanded with instructions to the trial court to determine what type of property interest was created by the sales agreement and whether or not defendants had violated the terms of the agreement. On May 12, 1977, C. Merle Dixon instituted an action against Holloway in Washtenaw Circuit Court. His complaint alleged several breaches of the sales agreement on the part of defendants, including continuation of operations after the agreement had expired, excessive stockpiling of sand and gravel, failure to properly account for sand and gravel removed and failure to compensate for material removed. Claims of fraud and misrepresentation were also contained in the complaint, which sought relief in the form of an accounting, damages and an injunction. The Evanses' and Dixons' actions were consolidated for trial. The court, George E. Montgomery, J., found no cause of action regarding all of the plaintiffs' claims as well as defendants' counterclaims. The court retained jurisdiction to supervise the reclamation of the land pursuant to the sales agreement. Plaintiffs appeal. *Held:*

1. A *profit a prendre* is a right growing out of the land involving primarily a power to acquire, by severance or removal from another's land, some things previously constituting a part of the land. Holloway's interest in the land was a *profit a prendre.* Because of the similarity of a *profit a prendre* to an easement in gross, the trial court's failure to distinguish between the two is immaterial.

2. The statutes allowing recording of conveyances of real property interests does not require recording for a conveyance to be valid but does provide that unrecorded conveyances are void as against a subsequent purchaser in good faith. The agreement was valid as between the parties. The Evanses, as purchasers with notice, took the property subject to Holloway's interest.

3. Holloway effectively exercised its option to renew.
Affirmed.

1. PROPERTY — PROFIT A PRENDRE — REAL PROPERTY.
   A *profit a prendre* is a right growing out of the land involving primarily a power to acquire, by severance or removal from another's land, some things previously constituting a part of

the land; a right to enter upon the land of another and remove gravel is a *profit a prendre*.

2. EASEMENTS — EASEMENT IN GROSS — REAL PROPERTY.

An easement is a privilege without profit which the owner of one parcel of land may have in the lands of another; an easement in gross is not appurtenant to any estate in land but constitutes a personal interest in, or right to use, the land of another.

3. PROPERTY — LICENSES — EASEMENTS.

To determine whether an agreement concerning real property creates a license or an interest in the property a court must look to the presence or absence of language ordinarily used in conveyances and of formalities normally observed in such transactions.

4. DEEDS — RECORDING OF DEEDS — STATUTES.

The statutes allowing recording of conveyances of real property interests does not require recording for a conveyance to be valid but does provide that unrecorded conveyances are void as against a subsequent purchaser in good faith (MCL 565.1, 565.29; MSA 26.521, 26.547).

*Davidson, Gotshall, Kohl, Secrest, Wardle, Lynch & Clark* (by *William P. Hampton*), and *William S. Evans*, for plaintiffs.

*John R. Brennan*, for defendants.

Before: DANHOF, C.J., and MAHER and BEASLEY, JJ.

DANHOF, C.J. Plaintiffs appeal as of right from the circuit court's decision finding no cause of action as to their claims against defendants Holloway Sand and Gravel, Inc., and its president, Daniel Holloway (henceforth referred to collectively as Holloway). The appeal followed the trial court's denial of plaintiffs' motion for additional findings or a new trial.

Plaintiffs C. Merle Dixon and his wife, Alma Dixon, were the owners of approximately 126 acres of land in Washtenaw County. On March 12, 1973,

the Dixons entered into a written agreement with Holloway authorizing Holloway to determine whether a commercial sand and gravel mine operation was feasible on the property and, if so, granting Holloway the right to remove sand and gravel for a two year period commencing May 1, 1973. Subsequent drilling tests showed the presence of large amounts of sand and gravel. Several months after the first agreement was signed, the parties executed a second document entitled "Sales Agreement" which was dated retroactively to March 12, 1973, and which, by its terms, superseded the original agreement. Paragraph 2 of the new agreement stated:

"That, the Sellers [Dixons] do hereby bargain and sell to the Purchaser [Holloway, Inc.] who agrees to pay for the same, on the terms and conditions hereinafter set forth, all sand, stone and gravel located in and on the * * * premises."

The Dixons were to be paid at a rate of ten cents per ton for all materials removed from the premises and the sales agreement contained the following provision for duration and renewal:

"This agreement shall be for a period of three (3) years from and after April 1, 1973. It may be renewed by Producer [sic] by giving notice of exercise of option to renew at least sixty days prior to its expiration, in writing."

Holloway was required to remove at least 50,000 tons of gravel per year or pay the sellers its equivalent value ($5,000). Holloway was permitted to stockpile up to 75,000 tons of material on the premises and was allowed to conduct mining operations on all but 26 acres of the property.

Holloway started mining sand and gravel on the

property pursuant to the sales agreement. C. Merle Dixon hired an attorney, Charles Dever, in November of 1974 to modify the agreement to allow capital gains treatment of his income from the mining operation. He also apprised Dever that Holloway was stockpiling excessive amounts of material on the premises and damaging trees and hedge rows. Negotiations took place and a new agreement was drafted and signed by Holloway; however, Dixon did not sign this agreement.

In April of 1975, the Dixons retained another attorney, plaintiff William E. Evans, for estate planning purposes. Subsequently, the Dixons agreed to sell Evans the property. On December 30, 1975, Evans sent a letter to Holloway stating that the proposed agreement drafted by Attorney Dever and signed by Holloway was unacceptable. He requested further negotiations regarding a new agreement. A meeting took place in January of 1976 between C. Merle Dixon, Evans and Holloway manager Nicholas Jabe, at which restoration of the gravel pit and certain statutory requirements were discussed. Holloway was not advised at this time that Evans intended to purchase the property.

Jabe sent a letter to the Dixons on January 22, 1976, advising them of Holloway's intent to exercise its option to renew pursuant to the March 12, 1973, sales agreement. The pertinent part of the letter stated:

"As per our Sales Agreement dated the 12th day of March, 1973 for the period of three (3) years from and after April 1, 1973. Please take notice that we would like to exercise our option to renew our Sales Agreement for the removal of Sand and Gravel from your property located at 2170 S. Zeeb Road. Ann Arbor, Michigan.

"May we please hear from you as soon as you have the new agreement ready. Thank you for your kind consideration in the above matter."

On March 22, 1976, a warranty deed was executed whereby C. Merle Dixon[1] conveyed the property to Evans and his wife for the price of $74,500. As part of the deal, the Evanses paid accrued taxes totaling $9,278 and purchased household and farm items for $15,000. In a separate conveyance, Dixon was granted a life estate in the property.

On April 15, 1976, Evans sent a letter to Holloway giving notice that he had purchased the property and that Holloway's presence on the property constituted a continuing trespass as of March 22, 1976. Holloway did not respond to this letter.

On April 19, 1976, plaintiffs William and Katherine Evans filed suit in Washtenaw County Circuit Court seeking an *ex parte* restraining order to prevent defendants from continuing sand and gravel mining on the property. The complaint alleged that the sales agreement had not been renewed or was not binding on the Evanses. Defendants filed an answer and counterclaims on April 22, 1976, contending that the Evanses were guilty of tortious interference with contractual relations, fraudulent representation and conspiracy. Plaintiffs Evanses filed supplemental pleadings on two occasions, adding counts to their original complaint. These included allegations of misrepresentation, breach of agreement due to excessive stockpiling of sand and gravel and fraudulent accounting practices. They also claimed damages for injury to their character and reputations due to false and malicious allegations in defendants' counterclaim.

---

[1] Alma Dixon had died on February 27, 1976.

The trial court initially denied the request for an *ex parte* restraining order and subsequently refused to issue a temporary injunction after hearing arguments on an order to show cause issued at the request of plaintiffs. On May 13, 1976, defendants filed a motion for summary judgment, which was granted by the court on July 26, 1976. In its opinion, the court found that the sales agreement created an easement or *profit a prendre* binding on the Evanses and also concluded that Holloway effectively exercised the option to renew the agreement. The order was appealed to this Court, which reversed on November 10, 1976, in an unpublished per curiam opinion.[2] The case was remanded with instructions to the trial court to determine what type of property interest was created by the sales agreement and whether or not defendants had violated the terms of the agreement.

On May 12, 1977, plaintiff C. Merle Dixon instituted an action against Holloway. His complaint alleged several breaches of the sales agreement on the part of defendants, including continuation of operations after the agreement had expired, excessive stockpiling of sand and gravel, failure to properly account for sand and gravel removed and failure to compensate for material removed. Claims of fraud and misrepresentation were also contained in the complaint, which sought relief in the form of an accounting, damages and an injunction.

Plaintiffs William and Katherine Evans filed a "Second Amended Complaint" on June 29, 1977, which basically repeated the allegations of their original complaint and its amendments. The Evanses' and Dixons' actions were consolidated for

---

[2] *Evans v Holloway Sand & Gravel Co, Inc,* Docket No. 29777, released November 10, 1976.

trial, and a bench trial was conducted. On January 22, 1979, the court rendered its opinion, finding no cause of action regarding all of the plaintiffs' claims as well as defendants' counterclaims. The court retained jurisdiction to supervise the reclamation of the land pursuant to the sales agreement.

Plaintiffs first challenge the trial court's determination that Holloway was the grantee of an interest in land under the sales agreement, consisting of either an easement in gross or a *profit a prendre*. They contend that the agreement created a mere revocable license for Holloway to enter the land and remove sand and gravel.

A *profit a prendre* is a right growing out of the soil. It involves primarily a power to acquire, by severance or removal from another's land, some thing or things previously constituting a part of the land. *St Helen Shooting Club v Mogle,* 234 Mich 60, 65, 68; 207 NW 915 (1926). An example of a *profit a prendre* is the right to enter upon the lands of another and remove gravel or other materials therefrom. *Stockdale v Yerden,* 220 Mich 444, 448; 190 NW 225 (1922), *State Highway Comm'r v Fegin,* 2 Mich App 698, 701; 141 NW2d 312 (1966).

An easement is a privilege without profit which the owner of one parcel of land may have in the lands of another. *Hasselbring v Koepke,* 263 Mich 466, 479; 248 NW 869 (1933). An easement in gross is not appurtenant to any estate in land but constitutes a personal interest in, or right to use, the land of another. *Smith v Dennedy,* 224 Mich 378; 194 NW 998 (1923). In the present case the trial judge failed to distinguish between an easement in gross and a *profit a prendre;* however, such failure is immaterial because of the similar nature of these property interests. The Restatement of Property addresses this point as follows:

"In this Restatement the term 'easement' is so used as to include within its meaning the special meaning commonly expressed by the term 'profit.' * * *

"Interests of the sort here discussed under the title 'Easements' have traditionally been discussed under the separate titles of 'Easements' and 'Profits.' In phrasing the rules applicable to each of these interests it has been found, however, that in no case was there a rule applicable to one of these interests which was also not applicable to the other. This is not true with respect to English law. Under that law the interest designated as an easement can exist only as an appurtenance of a dominant tenement, while a profit may exist independently of such a tenement, or, as it is commonly expressed, in gross. From this essential difference largely came the differentiating designations which we have inherited. The difference does not exist in this country. Here we have 'easements in gross' as well as 'profits in gross.' Since we have both 'easements in gross' and 'profits in gross' and since the rules with respect to both 'easements' and 'profits' can be stated in identical terms, it is much more convenient to use a single term to designate both interests rather than to use to the extent of annoying repetition the cumbersome phrase 'easements and profits.' " Restatement of Property, § 450, Special Note, pp 2901-2902.

Plaintiffs' primary argument is that the sales agreement did not convey an interest in land because the formalities ordinarily accompanying transfers of real estate were lacking. Interests in land are usually created or transferred only by act or operation of law or by written deed of conveyance. *Young v Thendara, Inc,* 328 Mich 42, 51; 43 NW2d 58 (1950), *Nowlin Lumber Co v Wilson,* 119 Mich 406, 410; 78 NW 338 (1899). In the present case, the trial court looked beyond the "Sales Agreement" title of the disputed instrument and concluded that it was effective to create a *profit a prendre* or an easement in gross. We believe it was proper for the judge to examine the entire agreement in order to ascertain the intent of the par-

ties. See, *Wade v Day,* 232 Mich 458; 205 NW 225 (1925), *Akers v Baril,* 300 Mich 619; 2 NW2d 791 (1942).

In *McCastle v Scanlon,* 337 Mich 122; 59 NW2d 114 (1953), and *McClintic-Marshall Co v Ford Motor Co,* 254 Mich 305; 236 NW 792 (1931), cited by plaintiffs, the Supreme Court considered whether the rights of a party constituted a license or an interest in real property. Controlling factors were stated to be the absence of language in the agreement ordinarily used in conveyances of real estate and the lack of formalities normally observed in such transactions. The sales agreement in the present case did not contain the type of granting clause found in a deed and did not use terms such as "easement", "lease", or *"profit a prendre".* However, various provisions in the agreement support the lower court's determination that a conveyance of a property interest was intended. The agreement included a legal description of the property. Paragraph 2, previously quoted, indicated a present sale of all sand, stone and gravel on the premises, utilizing the phrase "bargain and sale". This language does not support plaintiffs' argument that the actual transfer of ownership in the material was to take place after it had been removed and weighed. Paragraph 5 of the agreement stated:

"That, failure of the Purchaser to make aforesaid payments shall subject it to cancellation of this Sales Agreement *with the right of Seller to demand an execution of a reconveyance* of the remaining materials *hereby sold* to Purchaser who shall have two (2) years from the date of this agreement within which to remove all materials included herein after which time *the*

*rights of any unmined materials shall revert* to Seller
* * *." (Emphasis added.)[3]

Reference to a "reconveyance" and a reversion of
rights provides additional support for a finding
that a present conveyance to Holloway was in-
tended.

The agreement provided for payment after re-
moval of the sand and gravel, but the reason for
such a term was recited in Paragraph 4:

"That, *because the amount of sand, stone and gravel
cannot be ascertained exactly,* Purchaser shall pay to
Seller the sum of ten cents (10¢) per ton for all sand,
stone or gravel removed from said premises * * *."
(Emphasis added.)

Holloway did not have the ability to avoid a pay-
ment obligation by declining to mine material
because of the $5,000 per year minimum payment
requirement. Other relevant terms in the agree-
ment gave Holloway "full rights of ingress and
egress" and made its rights under the agreement
exclusive.

Based upon the language discussed above, we
conclude that the trial court did not err in finding
that Holloway possessed an easement or profit.
The Evanses, as purchasers of the property with
notice of Holloway's interest, took subject to the
easement (or *profit a prendre).* 10 Michigan Law &
Practice, Easements, § 17, p 112.

The lower court's decision does not contravene
the statute cited by plaintiffs dealing with convey-
ances and recording of interests in real estate.
MCL 565.1; MSA 26.521 states that interests in

---

[3] Mention of a two year term in this provision appears to have been
an oversight, since elsewhere the agreement specified a three year
term of duration.

land *may* be conveyed in the manner specified therein but does not impose absolute requirements. The recording statute, MCL 565.29; MSA 26.547, provides that unrecorded conveyances of real estate are void as against any subsequent purchaser in good faith. The Evanses were not good faith purchasers under the statute because they were aware of the sales agreement and its terms. See, *Wooden v Wooden,* 72 Mich 347; 40 NW 460 (1888). The fact that an instrument of conveyance is not executed with such formalities as to permit it to be recorded does not prevent it from being good as between the parties thereto. *Irvine v Irvine,* 337 Mich 344; 60 NW2d 298 (1953). Although the Evanses were not parties to the agreement, we find the same rule applicable to them because of their knowledge of the sales agreement.

Plaintiffs also contend that the lower court erred in concluding that Holloway exercised its option to renew the agreement for an additional three years. We disagree, based upon the January 22, 1976, letter from the Holloway manager to the Dixons. We further find no merit in plaintiffs' argument that the lower court made inadequate findings of fact regarding the exercise of the option.

Affirmed. Costs to defendants.