A. RICK AND MARJORIE E. D'ARCANGELO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
D'Arcangelo v. Commissioner
Docket No. 22991-92
United States Tax Court
T.C. Memo 1994-572; 1994 Tax Ct. Memo LEXIS 575; 68 T.C.M. (CCH) 1223; November 21, 1994, Filed *575 Decision will be entered under Rule 155. For petitioners: Laurence Keiser. For respondent: Gary Botwinick. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiency in and additions to petitioners' Federal income tax: Additions to Tax Year
Deficiency
Sec. 6659
Sec. 6621(c)
1986
$ 19,382
$ 5,194
[1]
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether petitioners are entitled to a charitable contribution deduction for their contribution of certain items of artwork and art supplies, and if so, in what amount; (2) if petitioners are entitled to a charitable deduction, whether petitioners are also entitled to a short-term capital loss for taxable year 1986; (3) whether petitioners are liable for an addition to tax under section 6659 for a valuation overstatement; (4) whether petitioners are liable *576 for increased interest under section 6621(c); and (5) whether petitioners are liable for the negligence additions to tax under section 6653(a)(1)(A) and (B). FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated into this Memorandum Opinion by reference and are found accordingly. Petitioners resided in Mamaroneck, New York, at the time they filed their petition. Background
Petitioner A. Rick D'Arcangelo (petitioner) is, and was at all relevant times, a certified public accountant (C.P.A.). Petitioner formed his own accounting firm, D'Arcangelo & Co. (the accounting firm), in Rome, New York, during the early 1950s. By 1986, the accounting firm also had offices in Poughkeepsie, Rye, and Harrison, New York. Petitioner has served as a president of the New York State Society of Certified Public Accountants and as a chairman of the New York State Board of Public Accountancy. During his earlier years as an accountant, petitioner handled detailed audits and the preparation of tax returns. By the 1970s, however, petitioner was no longer involved with accounting matters, but instead *577 was intricately involved in the administrative aspects of running the accounting firm. Petitioner was the managing partner of the accounting firm and served in such capacity until 1989. During the 1970s, petitioner was introduced by a business partner to an artist, Caesar Sabelli, now deceased. Petitioner greatly admired Mr. Sabelli's talent as an artist and purchased several pieces of artwork from Mr. Sabelli. Over time, petitioner and Mr. Sabelli became friends. When petitioner first met Mr. Sabelli, Mr. Sabelli operated a very small shop in Harrison, New York. Petitioner casually suggested to Mr. Sabelli that he open a larger shop in order to mass produce some of his artwork. Following petitioner's suggestion, Mr. Sabelli opened a larger craft and printing shop (the shop) in Mamaroneck, New York. Mr. Sabelli owed $ 20,000 to creditors as a result of opening the shop. Mr. Sabelli informed petitioner that he was having financial problems because he pursued petitioner's suggestion in opening the larger shop. Feeling somewhat responsible for Mr. Sabelli's financial problems, petitioner advanced Mr. Sabelli $ 20,000 and gave him several more advances over the next few years *578 as needed. Between 1975 through 1978, Mr. Sabelli borrowed a total of $ 62,618.37 from petitioner. During 1978, petitioner notified Mr. Sabelli that Mr. Sabelli would be unable to borrow any additional money. Mr. Sabelli was shocked that petitioner would not allow him to borrow any more money. Without the loans from petitioner, Mr. Sabelli was unable to maintain his shop. Consequently, Mr. Sabelli decided to hold an auction in order to sell finished items as well as printing and art equipment from the shop. Despite significant efforts, Mr. Sabelli was unable to sell much of the artwork or the printing and art equipment at the auction. After the auction, Mr. Sabelli closed his shop, leaving several pieces of artwork as well as equipment in the shop. Some of Mr. Sabelli's back rent had not been paid, and the landlord notified petitioner that if the rent was not paid, the items remaining in the shop were going to be discarded. Petitioner paid Mr. Sabelli's back rent. Petitioner then removed the artwork and equipment from the shop and placed the items in storage in the basement of an apartment house in New Rochelle, New York. On account of petitioner's refusal to allow Mr. *579 Sabelli to borrow any additional money, petitioner and Mr. Sabelli's friendship deteriorated. Petitioner and Mr. Sabelli no longer communicated with each other after petitioner retrieved the items from the shop and placed them in storage. Mr. Sabelli died on May 7, 1984. The items remained in storage until 1986. Petitioners' Donation to Mount Vernon High School
During 1986, petitioners retrieved the items from storage and donated them to Mount Vernon High School (the high school) in Mount Vernon, New York. Petitioners donated the following items to the high school: 95 silkscreens 35 rubber molds 60 boxes - small plastic shapes 21 boxes - large plastic shapes 3 cartons - coasters 1 box - coasters 1 carton - cardboard frames 3 large boxes - metal frames 1 small box - metal frames 1 bin - glass 11 cartons - glass 2 bins - wood and frame 3 large boxes - wood 17 small boxes - wood 50 metal plates - (zinc) 40 boxes - miscellaneous The chairman of the art department of the high school decided that the school had no use for the items. The chairman transferred the silkscreens to the Visual Arts Division of the State University of New York at Purchase, New York, *580 which was only interested in the frames. The remaining items, which had been stored at the high school, were subsequently discarded by the high school. Petitioners' Income Tax Returns
During 1978, after Mr. Sabelli closed his shop, petitioners realized that Mr. Sabelli would never repay the money that Mr. Sabelli had borrowed from him. Petitioners, therefore, reported a short-term capital loss from a nonbusiness debt in the amount of $ 62,618 on their Federal income tax return for taxable year 1978. Petitioners used $ 3,000 of the loss in 1978 and carried the balance forward. As a result of the carryover of the short-term capital loss from 1978, petitioners claimed short-term capital losses as follows: Taxable Year
1979
$  3,000
1980
3,000
1981
3,000
1982
3,000
1983
3,000
1984
3,000
1985
3,000
1986
27,685
Petitioners did not report any income or gain on their tax return for taxable year 1978 on account of the receipt of the items from the shop. Petitioners claimed other losses related to the items from Mr. Sabelli's shop on Schedule C of their tax returns for each of taxable years 1978 through 1986. [1] Additionally, petitioners claimed a charitable *581 contribution deduction on their 1986 Federal income tax return in the amount of $ 40,000. Petitioners attached Form 8283 along with a letter of appraisal from Richard Capozzola, the principal of the high school, to their 1986 tax return. Petitioner also claimed employee business expenses in the amount of $ 4,875. *582 In the notice of deficiency, respondent initially determined that petitioners overstated the value of their charitable contributions by $ 39,762 for taxable year 1986. Respondent also determined that petitioners were only entitled to deduct $ 2,938 of employee business expenses out of the $ 4,875 that they claimed on their return. Respondent further determined that petitioners were liable for an addition to tax under section 6659 for a substantial valuation overstatement and that all or part of the underpayment was due to tax motivated transactions which made petitioners liable for increased interest under section 6621(a). In respondent's amended answer to petitioners' amended petition, respondent asserted that as a result of petitioners' failure to obtain a qualified expert appraisal, the charitable contribution allowed in the amount of $ 238 in the notice of deficiency should be disallowed in full. In the alternative, respondent asserted that petitioners received a double deduction by claiming a charitable contribution deduction for the items contributed to the high school and a short-term capital loss for the bad debt with respect to those identical items. Consequently, respondent *583 asserted, in the alternative, that petitioners' short-term capital loss should be disallowed. [2] Respondent further asserted in the amended answer that the additions to tax for negligence should be imposed. OPINION Charitable Deduction
Respondent contends that petitioners are not entitled to a charitable deduction in the amount of $ 40,000 for taxable year 1986 because petitioners failed to obtain a "qualified appraisal" as required by section 1.170A-13T, Temporary Income Tax Regs., 49 Fed. Reg. 50659 (Dec. 31, 1984). Petitioners contend that the deduction cannot be disallowed for failure to comply with such requirement. Generally, the taxpayer bears the burden of proving that respondent's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). *584 Respondent, however, bears the burden of proof with respect to any new matters or increases in a deficiency. Rule 142(a). Consequently, petitioners bear the burden of proof with respect to respondent's disallowance of the charitable deduction in the amount of $ 39,762, as set forth in the notice of deficiency. Respondent bears the burden of proof with respect to the remaining $ 238 that respondent seeks to disallow and the disallowance of petitioner's short term capital loss, as set forth in the amended answer. Section 170(a)(1) permits taxpayers to deduct charitable contributions made within the taxable year. Section 170(a)(1) further provides that "A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." Section 1.170A-1(c)(1), Income Tax Regs., provides that the amount of the contribution is the fair market value of the property at the time of the donation. The regulation goes on to define the fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant *585 facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
On December 31, 1984, respondent issued section 1.170A-13T, Temporary Income Tax Regs., 49 Fed. Reg. 50659 (Dec. 31, 1984), setting forth certain recordkeeping and reporting requirements in order to take the deduction for charitable contributions. On May 5, 1988, respondent issued final regulations which, in pertinent part, are the same as the temporary regulations. As applicable to the instant case, section 1.170A-13 of the final regulations requires, inter alia, the following: (2) Substantiation requirements -- (i) In general. Except as provided in paragraph (c)(2)(ii) of this section, a donor who claims or reports a deduction with respect to a charitable contribution to which this paragraph (c) applies must comply with the following three requirements: (A) Obtain a qualified appraisal (as described in paragraph (c)(3) of this section) for such property contributed. * * * (B) Attach a fully completed appraisal summary (as defined in paragraph (c)(4) of this section) to the tax return * * * on which the deduction for the contribution is first claimed (or reported) by the donor.
* * * *586 (3) Qualified appraisal. -- (i) In general. For purposes of this paragraph (c), the term "qualified appraisal" means an appraisal document that -- (A) Relates to an appraisal that is made not earlier than 60 days prior to the date of contribution of the appraised property nor later than the date specified in paragraph (c)(3)(iv)(B) of this section; (B) Is prepared, signed, and dated by a qualified appraiser (within the meaning of paragraph (c)(5) of this section); (C) Includes the information required by paragraph (c)(3)(ii) of this section; and (D) Does not involve an appraisal fee prohibited by paragraph (c)(6) of this section.
(ii) Information included in qualified appraisal. A qualified appraisal shall include the following information: (A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed; (B) In the case of tangible property, the physical condition of the property; (C) The date (or expected date) of contribution to the donee; (D) The terms of any agreement or understanding *587 entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that -- (1) Restricts temporarily or permanently a donee's right to use or dispose of the donated property, (2) Reserves to, or confers upon, anyone (other than a donee organization or an organization participating with a donee organization in cooperative fund-raising) any right to the income from the contributed property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire, or (3) Earmarks donated property for a particular use; (E) The name, address, and * * * the identifying number of the qualified appraiser; and, if the qualified appraiser is acting in his or her capacity as a partner in a partnership, an employee of any person (whether an individual, corporation, or partnerships), or an independent contractor engaged by a person other than the donor, the name, address, and taxpayer identification *588 number (if a number is otherwise required by section 6109 and the regulations thereunder) of the partnership or the person who employs or engages the qualified appraiser; (F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations; (G) A statement that the appraisal was prepared for income tax purposes; (H) The date (or dates) on which the property was appraised; (I) The appraised fair market value (within the meaning of section 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution; (J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less depreciation approach; and (K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.
* * * (iv) Special rules * * * * * * (4) Appraisal summary -- (i) In general. For purposes of this paragraph (c), except as *589 provided in paragraph (c)(4)(iv)(A) of this section, the term "appraisal summary" means a summary of a qualified appraisal that -- (A) Is made on the form prescribed by the Internal Revenue Service [Form 8283]; (B) Is signed and dated (as described in paragraph (c)(4)(iii) of this section) by the donee (or presented to the donee for signature in cases described in paragraph (c)(4)(iv)(C)(2) of this section); (C) Is signed and dated by the qualified appraiser (within the meaning of paragraph (c)(5) of this section) who prepared the qualified appraisal (within the meaning of paragraph (c)(3) of this section); and (D) Includes the information required by paragraph (c)(4)(ii) of this section.
(ii) Information included in an appraisal summary. An appraisal summary shall include the following information: (A) The name and taxpayer identification number of the donor (social security number if the donor is an individual or employer identification number if the donor is a partnership or corporation); (B) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was *590 appraised is the property that was contributed; (C) In the case of tangible property, a brief summary of the overall physical condition of the property at the time of the contribution; (D) The manner of acquisition (e.g., purchase, exchange, gift, or bequest) and the date of acquisition of the property by the donor, or, if the property was created, produced, or manufactured by or for the donor, a statement to that effect and the approximate date the property was substantially completed; (E) The cost or other basis of the property adjusted as provided by section 1016; (F) The name, address, and taxpayer identification number of the donee; (G) The date the donee received the property; (H) For charitable contributions made after June 6, 1988, a statement explaining whether or not the charitable contribution was made by means of a bargain sale and the amount of any consideration received from the donee for the contribution; (I) The name, address, and (if a taxpayer identification number is otherwise required by section 6109 and the regulations thereunder) the identifying number of the qualified appraiser who signs the appraisal summary and of other persons as required *591 by paragraph (c)(3)(ii)(E) of this section; (J) The appraised fair market value of the property on the date of contribution; (K) The declaration by the appraiser described in paragraph (c)(5)(i) of this section; (L) A declaration by the appraiser stating that -- (1) The fee charged for the appraisal is not of a type prohibited by paragraph (c)(6) of this section; and (2) Appraisals prepared by the appraiser are not being disregarded pursuant to 31 U.S.C. section 330(c) on the date the appraisal summary is signed by the appraiser; and (M) Such other information as may be specified by the form.
(iii) Signature of the original donee. The person who signs the appraisal summary for the donee shall be an official authorized to sign the tax or information returns of the donee, or a person specifically authorized to sign appraisal summaries by an official authorized to sign the tax or information returns of such donee. * * * * * * (5) Qualified appraiser. -- (i) In General. The term "qualified appraiser" means an individual (other than a person described in paragraph (c)(5)(iv) of this section) who includes on the appraisal summary *592 (described in paragraph (c)(4) of this section), a declaration that -- (A) The individual either holds himself or herself out to the public as an appraiser or performs appraisals on a regular basis; (B) Because of the appraiser's qualifications as described in the appraisal (pursuant to paragraph (c)(3)(ii)(F) of this section), the appraiser is qualified to make appraisals of the type of property being valued; (C) The appraiser is not one of the persons described in paragraph (c)(5)(iv) of this section; and (D) The appraiser understands that an intentionally false or fraudulent overstatement of the value of the property described in the qualified appraisal or appraisal summary may subject the appraiser to a civil penalty under section 6701 for aiding and abetting an understatement of tax liability, and moreover, the appraiser may have appraisals disregarded pursuant to 31 U.S.C. section 330(c) (see paragraph (c)(3)(iii) of this section).
(ii) Exception. An individual is not a qualified appraiser with respect to a particular donation, even if the declaration specified in paragraph (c)(5)(i) of this section is provided in the *593 appraisal summary, if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property (e.g., the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property). (iii) Number of appraisers. More than one appraiser may appraise the donated property. If more than one appraiser appraises the property, the donor does not have to use each appraiser's appraisal for purposes of substantiating the charitable contribution deduction pursuant to this paragraph (c). If the donor uses the appraisal of more than one appraiser, or if two or more appraisers contribute to a single appraisal, each appraiser shall comply with the requirements of this paragraph (c), including signing the qualified appraisal and appraisal summary as required by paragraphs (c)(3)(i)(B) and (c)(4)(i)(C) of this section, respectively. (iv) Qualified appraiser exclusions. The following persons cannot be qualified appraisers with respect to particular property: (A) The donor or the taxpayer who claims or reports *594 a deduction under section 170 for the contribution of the property that is being appraised. (B) A party to the transaction in which the donor acquired the property being appraised (i.e., the person who sold, exchanged, or gave the property to the donor, or any person who acted as an agent for the transferor or for the donor with respect to such sale, exchange, or gift), unless the property is donated within 2 months of the date of acquisition and its appraised value does not exceed its acquisition price. (C) The donee of the property. (D) Any person employed by any of the foregoing persons (e.g., if the donor acquired a painting from an art dealer, neither the art dealer nor persons employed by the dealer can be qualified appraisers with respect to that painting). (E) Any person related to any of the foregoing persons under section 267(b), or with respect to appraisals made after June 6, 1988, married to a person who is in a relationship described in section 267(b) with any of the foregoing persons. (F) An appraiser who is regularly used by any person described in paragraph (c)(5)(iv)(A), (B), or (C) of this section and who does not perform a majority of his or her *595 appraisals made during his or her taxable year for other persons.
Petitioners contend that their Form 8283 and their letter of appraisal from Mr. Capozzola, as attached to their 1986 tax return, constitutes a "qualified appraisal" although it does not meet all of the requirements as set forth in section 1.170A-13, Income Tax Regs. Petitioners contend that an individual in the field of art is just as qualified to render an opinion as to the value of artwork as an individual in the appraisal business. Petitioners further contend that the fact that Mr. Capozzola is an employee of the "donee" should not prohibit him from serving as a "qualified appraiser". To support petitioners' position that the reporting requirements of section 1.170A-13, Income Tax Regs., are directory and not mandatory, petitioners cite Bond v. Commissioner, 100 T.C. 32 (1993). Respondent contends that Bond is inapplicable since petitioners have not substantially complied with the regulations. We agree with respondent. In Bond v. Commissioner, supra, the taxpayers claimed a charitable deduction in the amount of $ 60,000 for the contribution *596 of two blimps. The blimps had been appraised by a qualified appraiser who completed and signed respondent's Form 8283, which was attached to the taxpayer's return. In Bond, respondent disallowed the charitable deduction, asserting that the taxpayers failed to obtain and attach to their income tax return a written appraisal of the value of the blimps, as required by section 1.170A-13, Income Tax Regs. We held that the reporting requirements of section 1.170A-13, Income Tax Regs., are directory and not mandatory. Bond v. Commissioner, supra at 41. Because petitioner substantially complied with the regulations, we further held that the taxpayers were entitled to take the claimed deduction. In analyzing the requirements of section 1.170A-13, Income Tax Regs., in Bond, we relied on the following language from Taylor v. Commissioner, 67 T.C. 1071, 1077-1078 (1977): The critical question to be answered is whether the requirements relate "to the substance or essence of the statute." If so, strict adherence to all statutory and regulatory requirements is a precondition to an effective election. On the other *597 hand, if the requirements are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict, compliance. * * * [Citations omitted.]
Under the facts of Bond, the taxpayers had substantially complied with the regulations in that the blimps had been appraised by a qualified appraiser. Most of the information that would have been included in the qualified appraisal appeared on the Form 8283 attached to the return by the taxpayers. In Bond, we went on to say that: this is not a case where petitioner failed to obtain a timely appraisal of the donated property and thereby failed to establish its value for claiming a contribution deduction on their return. Instead, petitioners, in this case, met all of the elements required to establish the substance or essence of a charitable deduction, but merely failed to obtain and attach to their return a separate written appraisal containing the information specified in respondent's regulations even though substantially all of the specified information except the qualifications of the appraiser *598 [3] appeared in the Form 8283 attached to the Return. * * * [Bond v. Commissioner, 100 T.C. at 42.] Unlike the taxpayers in Bond, in the instant case, petitioners did not merely fail to attach evidence of a qualified appraisal, they altogether failed to obtain a qualified appraisal. The record does not establish that Mr. Capozzola, the high school's principal, holds himself out as an appraiser or performs appraisals on a regular basis. Consequently, we hold that he is not a qualified appraiser. Moreover, section 1.170A-13(c)(5)(iv)(D), Income Tax Regs., expressly prohibits an employee of the donee from making the appraisal. Although Mr. Capozzola stated *599 in his letter of appraisal (which was attached to the tax return) that "several art experts looked over the collection and donation", the letter did not include any details regarding the other art experts or their qualifications. [4]Section 1.170A-13(c)(5)(iii), Income Tax Regs., specifically requires that where two or more appraisers contribute to a single appraisal, each appraiser must comply with the requirements. Petitioners have not submitted any evidence to show that any of the purported art experts referred to in Mr. Capozzola's letter were qualified appraisers. Additionally, Mr. Capozzola's letter does not state the method used to determine the fair market value of the items or the specific basis of the valuation as required by section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs. The letter merely states that the "donation is worth in excess of $ 40,000". Finally, petitioner did not submit a fully completed appraisal summary. See sec. 1.170A-13(c)(4), Income Tax Regs.
*600 Petitioners further contend that the testimony of their expert, Carl Thomson, establishes that petitioners are entitled to a charitable deduction in the amount of $ 40,000 for taxable year 1986. Petitioners apparently contend that Mr. Thomson has, in effect, rendered a qualified appraisal. Mr. Thomson testified that he had visited Mr. Sabelli's shop and offered Mr. Sabelli $ 150,000 for the entire business. Mr. Thomson further testified that he wrote a letter, dated July 31, 1991, to petitioner in which he stated that the value of the business was derived from the silkscreens, molds, plates, and miscellaneous production items and that, in his opinion, such items were worth more than $ 75,000 in the late 1970s. In the letter, Mr. Thomson further stated that he thought the declared value of $ 40,000 as listed on petitioners' 1986 tax return was a conservative appraisal. Respondent, on the other hand, contends that Mr. Thomson's testimony should be afforded little, if any, weight. Respondent points to the following evidence to support the contention that Mr. Thomson's appraisal is of nominal value: (1) Mr. Thomson's testimony that he had no experience in the appraisal of printing *601 equipment and that he had never appraised silkscreens before looking at the items in Mr. Sabelli's shop; (2) Mr. Thomson's testimony and the documentary evidence establishing that Mr. Thomson only visited the shop once during 1979 or 1980, at least 6 years before petitioners contributed the items to the high school; [5] (3) Mr. Thomson's testimony that in order to do a proper appraisal, he would have been required to spend at least 2 weeks in the shop. (Mr. Thomson admitted that he only spent 1 hour in the shop and then decided he would be willing to pay $ 150,000 for the business.); (4) Mr. Thomson's testimony that he neither examined the books and records of the business nor compared the business to comparable businesses; (5) the fact that Mr. Thomson's estimate of the value of the business did not take into account that Mr. Sabelli had been borrowing any money from petitioner; (6) the fact that Mr. Thomson had no knowledge that the items he saw in the shop were the same items donated by petitioners; (7) the fact that Mr. Thomson had no knowledge of which items were contributed to the high school; (8) Mr. Thomson's testimony that the contributed items had the same value in 1986 *602 as they did when he saw them in the late 1970s in light of his statements that heat, humidity, and method of storage could affect the usefulness of items; [6] (9) Mr. Thomson's testimony that the number of times the screens had been used would affect their value especially since Mr. Thomson was unaware of how much Mr. Sabelli had used the items; (10) the fact that Mr. Thomson did not know if Mr. Sabelli had authority to make reproductions of other artists' work; and (11) the fact that most of the silkscreens were discarded because they were worthless to the high school. We agree with respondent's criticism of Mr. Thomson's appraisal. The most glaring criticisms *603 are the fact that Mr. Thomson had never appraised silkscreens before and the fact that Mr. Thomson was not even certain which items were donated. Also troublesome is the fact that he did not view the items at the time of donation. Such deficiencies in Mr. Thomson's appraisal lead us to conclude that Mr. Thomson's opinion does not qualify as a qualified appraisal. Accordingly, we sustain respondent's determination with respect to the $ 39,762 charitable deduction. Additionally, as the record establishes that petitioners never obtained a qualified appraisal, we hold that respondent has established that petitioners are not entitled to the remaining $ 238 deduction. Our holding that petitioners are not entitled to any portion of their claimed $ 40,000 charitable deduction, obviates our need to address respondent's alternative argument regarding the disallowance of the short-term capital loss for taxable year 1986. *604 Section 6659 Addition to Tax For Valuation Overstatement
Section 6659 provides that, in the case of an individual who has an underpayment in tax which is attributable to a valuation overstatement, there shall be added to the tax an amount equal to the applicable percentage. A valuation will be considered a valuation overstatement if the value of the property claimed on the return is 150 percent or more of the amount determined to be the correct amount of such valuation. Sec. 6659(c). Pursuant to section 6659(f)(1), the applicable percentage in the case of an underpayment *605 attributable to a valuation overstatement with respect to a charitable deduction is 30 percent. For purposes of section 6659(f), the term "charitable deduction property" means any contribution of property for which a deduction was claimed under section 170. An addition to tax under section 6659, however, will not be imposed if the understatement is less than $ 1,000. Sec. 6659(d). Petitioners have the burden of proof. Rule 142(a). Respondent contends that petitioners are liable for the addition to tax under section 6659 because petitioners had an underpayment which exceeded $ 1,000 for taxable year 1986 which was attributable to a valuation overstatement. Petitioners contend that regardless of whether Mr. Capozzola's letter of appraisal was a qualified appraisal, petitioners were entitled to rely on it. Petitioners further contend that petitioner was familiar with the items and had no reason to question the $ 40,000 value placed on them. We disagree. Section 6659(f) provides limitations on the Secretary's authority to waive any portion of the addition to tax under section 6659. Section 6659(f)(2) provides that the Secretary may not waive any portion of the addition to tax *606 unless the Secretary determines that: (1) The claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and (2) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property. Sec. 6659(f)(2)(A) and (B). Because petitioners did not obtain a qualified appraisal from a qualified appraiser and did not undertake any investigation to establish the value of the items, petitioners are liable for the addition to tax under section 6659. Accordingly, we sustain respondent's determination of the addition to tax under section 6659. Section 6621(c) Interest on Substantial Underpayment Attributable to Tax Motivated Transactions
Section 6621(c)(1) provides that the annual rate of interest with respect to any substantial underpayment attributable to tax motivated transactions shall be 120 percent of the underpayment rate. Section 6621(c)(2) defines the term "substantial underpayment attributable to tax motivated transactions" as any underpayment for any taxable year which is attributable to one or more tax motivated transactions if the amount of the underpayment exceeds $ 1,000. Section *607 6621(c)(3) defines "tax motivated transactions" to include "any valuation overstatement (within the meaning of section 6659(c))". Sec. 6621(c)(3)(A)(i). As we have held that petitioners had a substantial overstatement for purposes of section 6659(c), we sustain respondent's determination that petitioners are liable for interest in the amount of 120 percent of the underpayment rate. Section 6653 Additions to Tax For Negligence
Section 6653(a)(1) provides that if any part of an underpayment of tax is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to the sum of 5 percent of the underpayment and 50 percent of the interest due on the portion of the underpayment attributable to negligence. Generally, respondent's determination that petitioners were negligent is presumed correct, and petitioners bear the burden of proving that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Respondent, however, has the burden of proving all new matters; i.e., those matters raised after the issuance of the notice of deficiency. Respondent first asserted the negligence *608 additions to tax in an amended answer and accordingly has the burden of proving that petitioners were negligent. Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent contends that petitioners acted negligently because they did not make a reasonable attempt to comply with the tax laws. Respondent specifically points to the fact that petitioner is a C.P.A. and was exceptionally capable of properly preparing and reviewing his own tax return. Petitioners contend that they were not negligent because they relied on their return preparer and believed that their return preparer complied with the regulations. While reasonable reliance on a return preparer may, in some instances, relieve a taxpayer from liability for the additions to tax for negligence, we do not find petitioner's reliance to be reasonable in the instant case. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). *609 Petitioner was a C.P.A. who knew how to prepare tax returns. As managing partner of his accounting firm, petitioner was in charge of all employees and ultimately responsible for supervising work at the firm. In spite of his knowledge, petitioner ignored substantially all of the requirements for substantiation of charitable deductions under section 170. Based on the record in the instant case, we hold that respondent has established that petitioners acted negligently. See Marcy v. Commissioner, T.C. Memo. 1994-534. All other arguments of petitioners have been considered and found to be without merit. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. 120% of the interest due on $ 17,312.↩
1. On Schedule C for taxable year 1978, petitioners claimed a $ 4,587 loss. Petitioners reported that the "Main business activity" was "preparation for sale of art objects acquired in settlement of loans made". On Schedule C for taxable year 1979, petitioners claimed a $ 6,574 loss. Petitioners reported that the "Main business activity" was "preparation for sale of art objectsacquired in settlement of loans made." On Schedule C for taxable years 1980 and 1981, petitioners claimed losses of $ 3,160 and $ 1,135. Petitioners reported that the "Main business activity" was "Preparation for sale". The product listed on each of the returns was "Art" and "Art objects", respectively. A note on the bottom of each of the Schedule C Forms indicates that the items were "Acquired on foreclosure in settlement of loans made". On Schedule C for taxable year 1982, petitioners claimed a $ 1,295 loss. Petitioners reported that the "Main business activity" was "Preparation for sale". Petitioners listed the product as "art". A note on the Schedule C indicates that the products were "acquired on foreclosure in settlement of investment -- property to be sold". On their Schedule C for taxable year 1983, petitioners claimed a $ 900 loss. Petitioners reported that the "Main business activity" was "Reproduction of Art Work". A note on the Schedule C indicates that petitioner "acquired equip [sic] and supplies in settlement of debts to be liquidated". On their Schedule C for taxable years 1984, 1985, and 1986, petitioners claimed a loss of $ 900 in each year. Petitioners reported that the "Main business activity" or "Principal Business or Profession" listed thereon was "Repossession of Artwork".↩
2. In reviewing petitioners' tax return for taxable year 1986, we find that petitioner deducted $ 27,685 as a short-term capital loss and not $ 31,569 as asserted by respondent in the amended answer.↩
3. In Bond v. Commissioner, 100 T.C. 32↩ (1993), the Form 8283 included the name, title, place of employment, and the employer identification number of the appraiser. Additionally, the appraiser's qualifications were promptly given to respondent's agent at or near the commencement of the audit.
4. In Bond v. Commissioner, supra↩, the taxpayers did not include the appraiser's qualifications with their return, but promptly presented the appraiser's excellent credentials. In the instant case, however, the credentials do not meet regulation requirements.
5. We note that the record establishes that the shop closed in 1978, and petitioner took possession of the items in 1978 and put them in storage. Consequently, the shop was not in existence at the time Mr. Thomson claims to have visited it.↩
6. The record indicates that the silkscreens were not stored in their cases, which would shorten the life of the items.↩