T.C. Memo. 2014-15

UNITED STATES TAX COURT

BEN ALLI AND SHAKI ALLI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24863-11.                    Filed January 27, 2014.

Ben Alli and Shaki Alli, pro sese.

Alissa L.Vanderkooi, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  During 2008 an apartment building in Detroit, Michigan,

was contributed to Volunteers of America, a section 501(c)(3)[1] organization.  In

---

[1]Unless otherwise indicated, section references are to the Internal Revenue
Code in effect for the years at issue, and Rule references are to the Tax Court
Rules of Practice and Procedure.

[*2] respect thereof, petitioners claimed a noncash charitable contribution deduction of $499,000 on their 2008 joint Federal income tax return which they carried over in full to their 2009 return. Respondent disallowed the deduction and the carryover in full.

The issues before the court are:

(1) whether the contributed apartment building was owned by petitioners or a wholly owned corporation of petitioner husband when it was contributed. We hold that it was owned by the corporation;

(2) whether petitioners may claim a deduction with respect to the corporation's contribution where respondent is treating the corporation as an S corporation. We hold that they may;

(3) whether the qualified appraisal and other documentation requirements of section 170(f)(11) were satisfied by either of the two appraisals petitioners used to support the contribution and their appraisal summary. We hold that they were not;

(4) whether such noncompliance should be excused under the judicial doctrine of substantial compliance or for reasonable cause pursuant to section 170(f)(11)(A)(ii)(II). We hold that it should not.

[*3]                         FINDINGS OF FACT

Ben Alli is a medical doctor with a master's degree in public health from the University of Pittsburgh, an M.D. from St. George's School of Medicine in the West Indies, and a Ph.D. from Columbia University Union Graduate School. Originally from Africa, Dr. Alli has lived in the United States for over 40 years and is a U.S. citizen. In addition, Dr. Alli and his wife have three children. Petitioners resided in Michigan when they filed their petition.

BSA Corp.

Dr. Alli and his sister established BSA Corp. (BSA), a Michigan corporation which owns several apartment buildings in Detroit, Michigan.[2] After acquiring his sister's interest in BSA, Dr. Alli became BSA's sole shareholder. Petitioners reported BSA's 2008 rental income on Schedule E, Supplemental Income and Loss, of their personal return. Petitioners also reported BSA's 2008 depreciation deduction for its residential rental property on Form 4562, Depreciation and Amortization, of their personal return. Petitioners' 2008 return was prepared by Kent S. Siegel, a paid preparer.

---

[2]In his pretrial memorandum, respondent stated that he has no record of BSA's filing a corporate tax return for 2008 or 2009 but indicated that he is treating BSA as an S corporation.

[*4] The Pingree and Gladstone Properties

In 1983 petitioners purchased two apartment buildings, 2211 Pingree (Pingree) and 2987 Gladstone (Gladstone) from the U.S. Department of Housing and Urban Development (HUD) at a HUD auction for a total of $353,000. The purchase of these two buildings was financed by a HUD mortgage. Pingree and Gladstone participated in HUD's Section 8 housing program. As part of the program, in 1983 petitioners and HUD entered into a "Housing Assistance Payments" (HAP) contract and a regulatory agreement for the two properties. Pursuant to these contracts, petitioners were required to keep the properties in a decent, safe, and sanitary condition. In 1988 petitioners transferred Pingree and Gladstone to BSA.

In the early 1990s HUD became aware of significant problems at the two properties. In 1992 and 1993 HUD's Detroit office inspected the properties and discovered significant problems (e.g., missing smoke detectors and other fire hazards, roach infestation, peeling paint, significant water damage, etc.). HUD ordered Dr. Alli to effect all of the requisite repairs. Yet despite representations by Dr. Alli that most of the problems had been remedied, inspections in 1994, 1996, and 1997 revealed that the same deficiencies were still present.

**[\*5]** In 1998 a second HUD inspector again encountered many of the previously identified deficiencies at Pingree and Gladstone. After the failed inspection, Dr. Alli again represented that the identified deficiencies had either already been corrected or would be corrected within a few weeks. In 1999 when these corrections still had not materialized, HUD classified Pingree and Gladstone as "troubled property" and referred the properties to HUD's Department Enforcement Center (DEC).

In early 1999 a team from DEC inspected the properties and found the conditions to be deplorable--e.g., severe water damage; sink and shower units separating from the walls; actively leaking plumbing; damaged or inoperable appliances, doors and lighting; and roach infestation. Also in 1999 DEC contracted Pinnacle Realty Management Co. (Pinnacle) to conduct an independent review of the Pingree/Gladstone properties. Pinnacle reported that "[t]he picture painted by prior inspections is accurate" and that the properties did not meet minimum standards of decent, safe, and sanitary conditions. In late 1999 an inspection by HUD's Real Estate Assessment Center (REAC) confirmed the continuing existence of many past deficiencies as well as new ones. REAC also directed Dr. Alli to conduct a survey of the properties, which Dr. Alli failed to do.

**[*6]** In 2000 HUD notified petitioners that they had violated the regulatory agreement and defaulted on the Pingree/Gladstone HAP contract for failure to maintain the properties in a decent, safe, and sanitary condition. When petitioners again failed to correct the violations, HUD began relocating tenants and initiating foreclosure proceedings. Before HUD completed the foreclosure, however, petitioners paid off the balance of the HUD mortgage. On October 16, 2000, HUD recorded a "Discharge of Regulatory Agreement", which canceled the regulatory agreement that petitioners and HUD had entered into in 1983.[3]

HUD Litigation

On November 29, 2001, petitioners and BSA sued the United States and the Secretary of HUD for breach and termination of the Pingree/Gladstone HAP contract. The United States counterclaimed, alleging that petitioners and BSA breached the HAP contract by failing to provide decent, safe, and sanitary housing. On April 4, 2007, as part of the HUD litigation proceedings, petitioners and BSA stipulated that BSA currently owned and operated the Pingree/Gladstone apartments. In an opinion entered on August 26, 2008, the U.S. Court of Federal Claims held in favor of the United States and the Secretary of HUD and held

---

[3]The "Discharge of Regulatory Agreement" described the canceled regulatory agreement as one which identified petitioners as the owner and the Secretary of HUD as the insurer of Pingree and Gladstone.

[*7] against petitioners and BSA. The court further held that the corporate veil of BSA should be pierced.

Donation to Volunteers of America

On September 29, 2008, BSA, Dr. Alli, and Mrs. Alli executed a quitclaim deed of Gladstone to Volunteers of America, Michigan for nominal consideration (i.e., $1). On the same day, petitioners' son, Adeola Alli, also executed a quitclaim deed of Gladstone to Volunteers of America. On October 29, 2008, Volunteers of America sent Dr. Alli a letter thanking him for the contribution of Gladstone. The letter included a statement that Dr. Alli "received no goods or services as a result of this donation" and further enclosed a donation receipt. The donation receipt stated that the donation was made on October 23, 2008, and further provided Volunteers of America's taxpayer identification number.

At the time of the donation, only 6 of Gladstone's 34 apartment units had tenants. With regard to real property, Volunteers of America's policy was to find a prospective purchaser before it would accept a donation in order to minimize the organization's liability exposure. With regard to the donation of Gladstone, Brian Wilbur, the Director of Thrift Operations at Volunteers of America, contacted Roger Ackerman, a real estate agent with whom Mr. Wilbur had previously done business.

[*8]  Mr. Ackerman visited Gladstone twice.  The first time, he inspected only four or five of the apartment units.  The second time, Mr. Ackerman inspected nearly all 34 apartment units.  At trial Mr. Ackerman described the apartment units as "pretty rough" and opined that most of the units were "not rent-ready".  In addition, Mr. Ackerman observed that the elevator was broken, the roof leaked, the floors "heav[ed] up", kitchens were missing, and one apartment unit was completely burned.

Volunteers of America wished to sell the property quickly and entered into a contract on September 10, 2008, to sell Gladstone to an investor in California for $60,000.  This investor was the only person who expressed interest in purchasing Gladstone.

Petitioners' Form 8283

Petitioners reported the charitable contribution of Gladstone on Form 8283, Noncash Charitable Contributions, of their 2008 return.  On the Form 8283 petitioners described Gladstone as a "34 Unit Apartment Building" in "Good Condition" with an appraised fair market value of $499,000.  Petitioners further reported that they had acquired Gladstone in June 2000 and that their basis in Gladstone was $1,200,000.  Petitioners' Form 8283 did not include an appraiser's name, address, or identifying number, nor did it include an appraiser declaration.

**[*9]** In addition, petitioners' Form 8283 did not include the donee's signature, its taxpayer identification number, or its statement regarding whether the donor had received any consideration for the contribution.

Anthony Sanna Appraisal

On May 26, 1999, nearly a decade before the contribution of Gladstone, Anthony Sanna, MAI, conducted a market rent survey of the Pingree/Gladstone apartments (Sanna appraisal). Using the rental rates for five comparable apartment buildings, Mr. Sanna concluded that Pingree and Gladstone had an annual gross income potential of $390,840. Mr. Sanna did not estimate the fair market value of the Pingree/Gladstone apartments. In addition, the Sanna appraisal was not performed for income tax purposes, but rather for the purposes of HUD's Section 8 housing program. Finally, the Sanna appraisal did not include the date or expected date of Gladstone's contribution, nor did it include the terms of agreement regarding Gladstone's disposition.

Darvin Jones Appraisal

On April 24, 2008, approximately five months before the contribution of Gladstone, Darvin Jones made an appraisal of the Pingree/Gladstone apartments as an update to the 1999 Sanna appraisal (Jones appraisal). Mr. Jones determined the "market value" of Pingree to be $898,437 and the "market value" of Gladstone to

[*10] be $664,062, for a total of $1,562,500.  Mr. Jones defined "market value" as "the highest price estimate in terms of money which a property Will [sic] bring, if exposed for sale in the open market, allowing a reasonable time of [sic] Find [sic] a purchaser who buys with knowledge of all uses of which it is adapted, and for which it was capable of being used."

The Jones appraisal stated that the purpose of the appraisal was for establishing the properties' values "after the renovation and remodeled [sic] condition."  (Emphasis added.)  The appraisal elaborated that the "[v]aluation premise [sic] will assume a renovated market position.  Also, assumption will be made that normal management will be implemented."  In describing the exterior condition, the appraisal states:  "Condition will be projected as good.  Exterior painting, tuck pointing, and necessary repairs will be made [sic] good marketing position."[4]

In appraising Pingree and Gladstone, Mr. Jones used the cost approach and the income approach.  Because "[t]he assemblage of sales was difficult for establishing market value", Mr. Jones did not use the market approach.  With respect to the cost approach, Mr. Jones utilized a $40,000 per unit construction cost and 15-year life expectancy to estimate Pingree's value at $718,750 and

_____

[4]The renovations contemplated by the Jones appraisal were never made.

**[\*11]** Gladstone's value at $531,250, for a total value of $1,250,000. With respect to the income approach, Mr. Jones determined the market rental rate using 9 comparable apartment buildings, estimated expenses using 25 comparable apartment buildings, and assumed a 5% vacancy rate. On the basis of these figures, Mr. Jones estimated the Pingree/Gladstone apartments' annual net operating income to be $250,268.[5] Mr. Jones then appraised the Pingree/Gladstone apartments at a "market value" of $1,562,500, using the mortgage equity process and a capitalization rate of 16%. Mr. Jones based this capitalization rate on the elevated risk involved with real estate investments, a projected interest rate of 12%, and a projected loan term of 15 years.[6]

The "Reconciliation and Conclusion" section of the appraisal stated that the value of Pingree/Gladstone was $1,562,500 under each of the income approach, the market approach, and the cost approach, and thereby yielded a final

---

[5]In comparison, petitioners' 2008 return reported rents received of merely $81,909, expenses of $162,649, and losses of $80,740 for the Pingree/Gladstone apartments.

[6]Because we need not decide Gladstone's fair market value, we do not find it necessary to evaluate Mr. Jones' assumptions; however, we suspect that some of his assumptions may have been unreasonable, such as the 12% interest rate.

**[*12]** "reconciled" value of $1,562,500.[7] The Jones appraisal concluded by reiterating that the "[f]inal valuation projection, as previously mentioned, will be based on the renovated marketing position of [sic] subject property. Renovation will conform to the plans and specifications developed for this specific capital input."

Finally, the Jones appraisal omitted the date or expected date of Gladstone's contribution, the terms of agreement regarding Gladstone's disposition, a statement that the appraisal was performed for income tax purposes, and Mr. Jones' qualifications and identifying number.

## OPINION

The primary issue in this case is whether petitioners are entitled to a deduction for the charitable contribution of Gladstone.

---

[7]We note that the "Reconciliation and Conclusion" section of the Jones appraisal included a number of errors. First, that section purported to reconcile valuations made using the income approach, the market approach, and the cost approach, when in fact the body of the appraisal included only valuations made using the cost approach and the income approach. Second, the reconciliation section stated that both the cost approach and the income approach yielded valuations of $1,562,500, when in fact, the cost approach actually yielded a valuation of $1,250,000 according to the body of the appraisal.

**[*13]** I.    <u>Burden of Proof</u>

With respect to deductions, the Commissioner's determinations in a notice of deficiency are presumed correct and the taxpayer bears the burden of proving by a preponderance of the evidence that the Commissioner's determinations are erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>see also</u> <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992) ("'[A]n income tax deduction is a matter of legislative grace and * * * the burden of clearly showing the right to the claimed deduction is on the taxpayer.'" (quoting <u>Interstate Transit Lines v. Commissioner</u>, 319 U.S. 590, 593 (1943))).

II.    <u>Ownership of Gladstone</u>

The parties dispute the ownership of Gladstone as of the date that Gladstone was contributed. Respondent argues that petitioners are not entitled to a deduction for the contribution of Gladstone because Gladstone did not belong to them. According to respondent, the quitclaim deeds which transferred Gladstone to Volunteers of America prove that Gladstone belonged, at least in part, to BSA or to petitioners' son, Adeola Alli. Petitioners argue that although they personally

[*14] owned Gladstone, BSA and their son executed these deeds because Volunteers of America required a broad release before accepting donations of real property.[8]

While the record is thin on the issue of who owned Gladstone at the time of the contribution, we hold that BSA was the sole owner. As late as April 2007 petitioners admitted, as part of the HUD litigation proceedings, that BSA owned and operated Gladstone.

Petitioners rely primarily on a "Good Faith Confidential Agreement" and the "Discharge of Regulatory Agreement" to establish their personal ownership of Gladstone at the time of the donation. We find neither to be persuasive evidence. With respect to the "Good Faith Confidential Agreement", on June 23, 2004, petitioners entered into the agreement, which purported to relieve BSA of its ownership of both Pingree and Gladstone. However, BSA, the owner of these properties at the time, was not a party to the agreement. Moreover, the agreement was not recorded.[9]

_____

[8]Petitioners allege that Volunteers of America required Adeola Alli to execute a quitclaim deed because he had a recorded lien on Gladstone. The alleged lien, however, is not part of the record.

[9]It is unclear whether, under Michigan law, see Carpenter v. Commissioner, T.C. Memo. 2012-1, 103 T.C.M. (CCH) 1001, 1004 (2012) (holding that State law

(continued...)

**[\*15]** With respect to the "Discharge of Regulatory Agreement", the agreement does not identify petitioners as the owners of Gladstone. Rather it identifies the regulatory agreement being canceled as one which lists petitioners as the owners. Indeed, when the regulatory agreement was entered into in 1983, petitioners were the owners of Gladstone and were correctly listed on the regulatory agreement as such. Finally, both documents predate petitioners' admission in 2007 that BSA was the owner of Gladstone. For these reasons, we choose not to credit the "Good Faith Confidential Agreement" or the "Discharge of Regulatory Agreement" as credible evidence that Gladstone belonged to petitioners.

Although BSA was the owner of Gladstone at the time of the contribution, petitioners could still be entitled to the charitable contribution deduction that they claimed. Respondent stated in his pretrial memorandum that he is treating BSA as an S corporation. As a general rule, an S corporation is not subject to tax at the corporate level. Sec. 1363(a). Rather, pursuant to section 1366(a), the S

---

[9](...continued)
determines the nature of the property rights, and Federal law determines the appropriate tax treatment of those rights), an unrecorded conveyance would be effective against respondent--a third party with an economic interest with respect to the property and without notice of the conveyance, cf. Evans v. Holloway Sand & Gravel, Inc., 308 N.W.2d 440, 444 (Mich. Ct. App. 1981) ("[Michigan's] recording statute * * * provides that unrecorded conveyances of real estate are void as against any subsequent purchaser in good faith.").

[*16] corporation's income or loss flows through to its shareholders and is taxed at the shareholder level. Certain items of income, loss, deduction, or credit flow through separately to the shareholders, sec. 1366(a)(1)(A), whereas others are included in the S corporation's nonseparately computed income or loss, which in turn flows through to the shareholders, sec. 1366(a)(1)(B). Deductions for charitable contributions pursuant to section 170 flow through separately to the shareholders, sec. 1366(a)(1), and are not allowed to the S corporation, sec. 1363(b)(2). Since Dr. Alli is BSA's sole shareholder, BSA's entire charitable contribution deduction for its contribution of Gladstone would flow through to him if all the charitable contribution requirements set forth in section 170 are met.

Section 170(f)(11)(G)[10] provides that "[i]n the case of a partnership or S corporation, * * * [the qualified appraisal and other documentation requirements] shall be applied at the entity level, except that the deduction shall be denied at the partner or shareholder level." We must therefore determine whether BSA has

---

[10]On November 12, 2013, the Court ordered the parties to brief what implications, if any, sec. 170(f)(11)(G) has on this case. Petitioners' brief covered a number of issues which were not responsive to the Court's order. Accordingly, we disregard those portions of petitioners' brief.

[*17] satisfied the qualified appraisal and other documentation requirements for its contribution of Gladstone.[11]

## III.  History of the Qualified Appraisal and Other Documentation Requirements

In the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155(a), 98 Stat. at 691, Congress amended section 170 to require taxpayers claiming a deduction for a charitable contribution "to obtain a qualified appraisal for the property contributed", "to attach an appraisal summary to the return", and "to include on such return additional information (including the cost basis and acquisition date of the contributed property) as the Secretary may prescribe in such regulations".  Before DEFRA, a taxpayer was required to include certain information in his return for deducting contributions of property exceeding $200 but was not required to obtain an appraisal before claiming such a deduction.  See S. Prt. No. 98-169 (Vol. 1) at 443 (S. Comm. Print 1984).

---

[11]Although S corporations used to be subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, which required taxpayers to challenge an S corporation's taxes in a single, corporation-level proceeding, Congress repealed this part of TEFRA in the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, sec. 1307(c)(1), 110 Stat. at 1781.  Winter v. Commissioner, T.C. Memo. 2010-287, 100 T.C.M. (CCH) 604, 605 n.2 (2010).  Accordingly, the Court has jurisdiction to address BSA's taxes as part of petitioners' shareholder-level proceeding.  See Winter v. Commissioner, 135 T.C. 238, 245-246 (2010).

**[\*18]** The principal objective of DEFRA sec. 155 was to provide a mechanism whereby the IRS would obtain sufficient information in support of a claimed valuation of a charitable contribution of property to enable the IRS to deal more effectively with the prevalent use of overvaluations. See id. at 444-445; Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 503-505 (J. Comm. Print 1984). The Secretary promulgated section 1.170A-13(c), Income Tax Regs., pursuant to his authority under DEFRA sec. 155(a)(1).[12]

In the American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631, Congress codified these requirements as section 170(f)(11) and provided a reasonable cause exception for failure to comply with

---

[12]Chevron deference--i.e., giving legislative regulations controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute, Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)--applies "with full force in the tax context", Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. ___, ___, 131 S. Ct. 704, 713 (2011). The ultimate question is whether the regulations are within or outside of Congress' delegation to the agency. Id. at ___, 131 S. Ct. at 714. With respect to the charitable contribution substantiation and reporting regulations, Congress not only delegated general rulemaking authority to the Secretary in sec. 7805(a) to "prescribe all needful rules"; Congress also delegated specific rulemaking authority in the Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 155(a)(1), 98 Stat. at 691, that "[n]ot later than December 31, 1984, the Secretary shall prescribe regulations under section 170(a)(1) of the Internal Revenue Code * * * [for the substantiation of contributions of property]".

[*19] the substantiation requirements for charitable contributions made after June 3, 2004.

IV.     Qualified Appraisal and Other Documentation Requirements

Where a deduction is claimed for contributions in excess of $5,000, a taxpayer must "obtain[] a qualified appraisal of such property and attach[] to the return * * * such information regarding such property and such appraisal as the Secretary may require."  Sec. 170(f)(11)(C).  A qualified appraisal is "an appraisal of such property which * * * is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed * * *[by the Secretary]".  Sec. 170(f)(11)(E)(i)(II).

Under section 1.170A-13(c)(2), Income Tax Regs, a donor who claims a deduction with respect to a contribution in excess of $5,000 must:  (1) obtain a qualified appraisal for the property contributed; (2) attach a fully completed appraisal summary to his tax return; and (3) maintain records containing certain information (as required by  paragraph (b)(2)(ii)[13] of this section).

---

[13]Sec. 1.170A-13(b)(2)(ii), Income Tax Regs., requires the taxpayer to maintain the following information:  (1) the name and address of the donee organization to which the contribution was made; (2) the date and location of the contribution; (3) description of the property in detail reasonable under the circumstances (including the value of the property); (4) the fair market value of the property at the time the contribution was made, the method used in

(continued...)

**[\*20]**  Where the donor is an S corporation, the donor must provide a copy of the appraisal summary to every shareholder who receives an allocation of a charitable contribution deduction with respect to the property described in the appraisal summary.  Sec. 1.170A-13(c)(4)(iv)(F), Income Tax Regs.  Furthermore, the shareholder must attach a copy of the S corporation's appraisal summary to his tax return.  Sec. 1.170A-13(c)(4)(iv)(G), Income Tax Regs.

In this case, the donor of Gladstone is BSA.  However, BSA never filed a corporate return for 2008.  Rather, petitioners reported BSA's activities on Schedule E of their personal 2008 return.  Because BSA did not attach an appraisal summary for Gladstone to its corporate return, it failed to meet the requirement of section 1.170A-13(c)(2), Income Tax Regs.  Petitioners, however, did attach an appraisal summary for Gladstone to their personal return, as required by section 1.170A-13(c)(4)(iv)(G), Income Tax Regs.  Although BSA's failure to file a corporate return, and its failure to attach the Gladstone appraisal summary thereto, may constitute sufficient grounds for disallowing the charitable contribution deduction, we need not decide this issue because we hold that neither

---

[13](...continued)
determining the fair market value, and, if the valuation was determined by appraisal, a copy of the signed report of the appraiser; (5) the cost or other basis of the property; and (6) the terms of any agreement relating to the use, sale, or other disposition of the property contributed.

[*21] the Sanna appraisal nor the Jones apprisal is a qualified appraisal under section 170(f)(11).

A.    Qualified Appraisal

Under the regulations, a qualified appraisal must be made no more than 60 days before the gift and no later than the due date of the return, must be signed by a qualified appraiser, must not involve a prohibited appraisal fee,[14] and must include certain specific information.  Sec. 1.170A-13(c)(3)(i), Income Tax Regs. This information includes:

> (A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

> (B) In the case of tangible property, the physical condition of the property;

> (C) The date (or expected date) of contribution to the donee;

> (D) The terms of any agreement or understanding entered into * * * that relates to the use, sale, or other disposition of the property contributed * * *;

---

[14]Sec. 1.170A-13(c)(6)(i), Income Tax Regs., provides that "no part of the fee arrangement for a qualified appraisal can be based, in effect, on a percentage (or set of percentages) of the appraised value of the property."  Respondent makes no claim regarding whether Mr. Sanna or Mr. Jones received an impermissible fee pursuant to sec. 1.170A-13(6)(i), Income Tax Regs., so we do not further address that issue.

**[*22]** (E) The name, address, and * * * the identifying number of the qualified appraiser * * *;

      (F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

      (G) A statement that the appraisal was prepared for income tax purposes;

      (H) The date (or dates) on which the property was appraised;

      (I) The appraised fair market value * * * of the property on the date (or expected date) of contribution;

      (J) The method of valuation used to determine the fair market value * * *; and

      (K) The specific basis for the valuation * * *.

Sec. 1.170A-13(c)(3)(ii), Income Tax Regs.

Petitioners argue that the Jones appraisal is an update of the Sanna appraisal and that both appraisals constitute qualified appraisals. We note that under the regulations, if a donor uses the appraisal of more than one appraiser, each appraiser must comply with the qualified appraisal requirements. Sec. 1.170A-13(c)(5)(iii), Income Tax Regs. Both the Sanna appraisal and the Jones appraisal, individually and collectively, suffer from a number of material deficiencies. These deficiencies are addressed in more detail below.

**[\*23]**        1.        <u>Sanna Appraisal</u>

The Sanna appraisal is deficient in at least five requirements of the regulations, which we address below in turn.

a.        <u>Timeliness of Appraisal Requirement</u>

The Sanna appraisal's primary defect is that it was made in 1999, nearly a decade before the contribution of Gladstone in 2008.  Under the regulations, a qualified appraisal must be prepared by a qualified appraiser no earlier than 60 days before the contribution date and no later than the extended due date of the return first claiming the deduction.  Sec. 1.170A-13(c)(3)(i)(A), Income Tax Regs. The time limitation for obtaining a qualified appraisal is important because the appraised value must be the fair market value of the contributed property <u>on the date of contribution</u>.  Sec. 1.170A-13(c)(3)(ii)(I), Income Tax Regs.  Therefore, an appraisal performed outside of the safe harbor period provided in section 1.170A-13(c)(3)(i)(A), Income Tax Regs., prima facie does not reflect the property's value as of the date of contribution.  We have held that an untimely appraisal is not a qualified appraisal.  <u>Van der Lee v. Commissioner</u>, T.C. Memo. 2011-234, 102 T.C.M. (CCH) 329, 336 (2011), <u>aff'd</u>, 501 Fed. Appx. 30 (2d Cir. 2012).

Petitioners implicitly concede this point.  In brief, petitioners argue that the results of the 1999 HUD inspection are irrelevant for establishing the value of

**[*24]** Gladstone as of the contribution date because the inspection was a "decade old". It follows that the Sanna appraisal, dated May 26, 1999, is inadequate because it too was prepared and dated nearly a decade before the contribution was made.

Petitioners argue that although the Sanna appraisal is nearly a decade old, it is relevant to establishing the value of Gladstone as of the date of contribution because the Jones appraisal is an update of the Sanna appraisal. The regulations, however, provide that where a taxpayer relies on more than one appraisal, each appraisal must <u>independently</u> comply with the qualified appraisal requirements. Sec. 1.170A-13(c)(5)(iii), Income Tax Regs. As we discuss later, the Jones appraisal is also not in compliance with the regulations.

b.       <u>Date or Expected Date of Contribution Requirement</u>

The Sanna appraisal does not include the date or expected date of contribution for Gladstone. Section 1.170A-13(c)(3)(ii)(C), Income Tax Regs., provides that a qualified appraisal must include "[t]he date (or expected date) of contribution to the donee". The date of contribution requirement is important because it allows the IRS to determine whether the appraisal was timely performed. We have stated that the purpose of the charitable contribution reporting regulations is to provide the IRS with sufficient information to evaluate

[*25] the claimed deduction and deal more effectively with the prevalent use of overvaluations. Smith v. Commissioner, T.C. Memo. 2007-368, 94 T.C.M. (CCH) 574, 586 (2007) (citing Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998)), aff'd, 364 Fed. Appx. 317 (9th Cir. 2009).

### c. Terms of the Agreement Requirement

A qualified appraisal must include "[t]he terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed". Sec. 1.170A-13(c)(3)(ii)(D), Income Tax Regs. The terms of agreement requirement is important because it enables the IRS to determine whether the appraiser took restrictions on the disposition of the contributed property into account when appraising it. As we have stated, "[r]estrictions on the property's use or marketability on the date of the contribution must be taken into account in the determination of fair market value." Rolfs v. Commissioner, 135 T.C. 471, 481 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012); see also Cooley v. Commissioner, 33 T.C. 223, 225 (1959) ("'[F]air market value' is not to be determined in a vacuum. To the contrary, it must be determined with respect to the particular property in question at the time of contribution, subject to any

[*26] conditions or restrictions on marketability."), aff'd, 283 F.2d 945 (2d Cir. 1960).

We have recognized that restrictions on the disposition of property may reduce the fair market value of the property. See generally Knight v. Commissioner, 115 T.C. 506 (2000). As stated earlier, the purpose of the charitable contribution reporting regulations is to provide the IRS with sufficient information to evaluate the claimed deduction and deal more effectively with the prevalent use of overvaluations. Smith v. Commissioner, 94 T.C.M. (CCH) at 586. Therefore, in order for the IRS to have sufficient information to evaluate the appraisal, the appraisal must show that it took into account the conditions, if any, on the disposition of the contributed property. The Sanna appraisal, performed nearly a decade before Gladstone was contributed, did not include the terms of any agreement or understanding relating to the disposition of Gladstone--e.g., that pursuant to its policy, Volunteers of America would not accept the donation of Gladstone until a purchaser had been arranged.[15] For this reason, the Sanna

---

[15]Sec. 1.6050L-1, Income Tax Regs., provides that "[i]f a donee of any charitable deduction property * * * sells, exchanges, consumes, or otherwise disposes of (with or without consideration) such property * * * within 2 years after the date of the donor's contribution of such property, the donee shall make an information return on the form prescribed by the Internal Revenue Service."

Thus, disclosure of the donee's terms, if any, regarding the disposition of

(continued...)

[*27] appraisal does not comply with section 1.170A-13(c)(3)(ii)(D), Income Tax Regs.

### d. Income Tax Purposes Statement Requirement

The Sanna appraisal does not include a statement that it was prepared for income tax purposes. A qualified appraisal must include "[a] statement that the appraisal was prepared for income tax purposes". Sec. 1.170A-13(c)(3)(ii)(G), Income Tax Regs. Neither exact wording nor an explicit statement is necessary. See Irby v. Commissioner, 139 T.C. 371, 386-387 (2012) (the income tax purposes statement requirement is satisfied where the appraisal report states "that the purpose of the appraisal was to value the donation of * * * [property] pursuant to the terms of section 170(h)"); Simmons v. Commissioner, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, 215 (2009), aff'd, 646 F.3d 6 (D.C. Cir. 2011).

The Sanna appraisal does not state that it was prepared for income tax purposes, but rather states that it was prepared for the purposes of HUD's Section 8 housing program. Accordingly, the Sanna appraisal does not comply with section 1.170A-13(c)(3)(ii)(G), Income Tax Regs.

---

[15](...continued)
contributed property may constitute important information that the IRS needs to account for any discrepancies between the sale value reported by the donee and the appraised fair market value reported by the donor.

**[\*28]**          e.          Appraised Fair Market Value Requirement

The Sanna appraisal does not provide a fair market value appraisal of

Gladstone. A qualified appraisal must include "[t]he appraised fair market value

(within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected

date) of contribution". Sec. 1.170A-13(c)(3)(ii)(I), Income Tax Regs. The

appraised fair market value requirement is critical because that is the value upon

which the charitable contribution deduction is based. Without it, the entire

purpose of requiring the taxpayer to obtain a qualified appraisal is undermined.

Three approaches measure the fair market value of property: the market

approach (i.e., the comparable sales approach), the asset-based approach (i.e., the

cost approach), and the income approach. Crimi v. Commissioner, T.C. Memo.

2013-51, at \*62-\*63 (citing Bank One Corp. v. Commissioner, 120 T.C. 174, 307

(2003), aff'd in part and vacated in part sub nom. JPMorgan Chase & Co. v.

Commissioner, 458 F.3d 564 (7th Cir. 2006)). The market approach values the

subject property by comparing the property to similar properties sold in

arm's-length transactions in or about the same period. Id. The asset-based

approach generally values the subject property by determining the cost to

reproduce it. Id. Finally, the income approach determines the value of the subject

property by capitalizing or discounting expected cashflows therefrom. Id.

**[\*29]**  An appraiser should employ as many approaches as are appropriate.  See, e.g., Hilborn v. Commissioner, 85 T.C. 677, 689 (1985) ("[T]o the extent possible, the three commonly recognized methods of valuing property (capitalized net operating income, replacement cost and comparable sales) are used[.]"); Crimi v. Commissioner, at \*18 ("[V]alue should be obtained from [all] three approaches and reconciled in a final value estimate[.]"); In re Landing Assocs., Ltd., 122 B.R. 288, 296 (Bankr. W.D. Tex. 1990) ("No one approach by itself yields the true value of the property."); Appraisal Institute, The Appraisal of Real Estate 141 (13th ed. 2008) ("Appraisers should apply all the approaches that are applicable and for which there is data.").

The Sanna appraisal did not employ the market approach, the asset-based approach, or the income approach to determine the fair market value of Gladstone. Instead, it merely estimated Gladstone's annual profit potential using a projected income stream.  It did not perform a discounted cashflow analysis on the estimated profit potential to determine Gladstone's fair market value.  Because the Sanna appraisal did not employ any of the three approaches to determine Gladstone's fair market value, it does not comply with section 1.170A-13(c)(3)(ii)(I), Income Tax Regs.

We now turn to the Jones appraisal.

**[\*30]**  2.  <u>Jones Appraisal</u>

The Jones appraisal is deficient in at least nine requirements of the regulations, which we address below in turn.

a.  <u>Appraisal of the Contributed Property Requirement</u>

The Jones appraisal's primary deficiency is that it is not an appraisal of the contributed property but is rather an appraisal of a hypothetical, fully renovated version of the contributed property. Under the charitable contribution statute, where a deduction is claimed for contributions in excess of $5,000, the taxpayer must obtain a <u>qualified appraisal of such property</u>. Sec. 170(f)(11)(C). In order for the qualified appraisal to help the IRS "deal more effectively with the prevalent use of overvaluations", the appraised property must be the same property that was donated and that gave rise to the claimed deduction.

In <u>Harding v. Commissioner</u>, T.C. Memo. 1995-216, 69 T.C.M. (CCH) 2625, 2629 (1995), we held that the qualified appraisal requirement was not satisfied where the appraisal was "purely hypothetical", was "at best, \* \* \* the maximum conceivable estimate value for \* \* \* [the property]", and "did not take into account the extant realities". Likewise, the Jones appraisal did not appraise Gladstone as contributed but rather appraised a hypothetical, fully renovated Gladstone. The Jones appraisal repeatedly emphasized that its valuation was

[*31] premised on the "renovated and remodeled condition" of Gladstone. Mr. Ackerman, the real estate agent whom Volunteers of America contacted regarding Gladstone's sale and who visited Gladstone on two occasions, testified that at the time of the donation Gladstone was in poor condition and that most units were uninhabitable. Mr. Ackerman's testimony is confirmed by the fact that Gladstone had tenants in only six units at the time of the donation. Because the subject of the Jones appraisal was a hypothetical, fully renovated Gladstone, the Jones appraisal does not comply with the section 170(f)(11)(C) requirement that the taxpayer obtain an appraisal of the contributed property.

    b. <u>Description and Condition of the Property Requirements</u>

The Jones appraisal did not describe Gladstone as it existed but rather described a hypothetical, fully renovated Gladstone. Under the regulations a qualified appraisal must include "a description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed". Sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs. "In the case of tangible property, [a qualified appraisal must also include] the physical condition of the property." Sec. 1.170A-13(c)(3)(ii)(B), Income Tax Regs. The description requirement is "important, indeed essential, to the review of charitable

[*32] contribution deductions and the reliability of corresponding appraisals."

Bruzewicz v. United States, 604 F. Supp. 2d 1197, 1206 (N.D. Ill. 2009). Indeed,

"[a]bsent a description of the * * * [contributed property], the appraisal and its

valuation of the donated property are meaningless. There is no way for the IRS or

any outside party to judge whether the appraisal is reasonable or to understand the

basis for the valuation of such undefined contributed property." Id. The condition

of tangible property requirement is equally important for this same reason. Since

the Jones appraisal did not include a description of Gladstone as contributed nor

describe the condition of Gladstone as contributed, it does not comply with section

1.170A-13(c)(3)(ii)(A) and (B), Income Tax Regs.

### c. Appraised Fair Market Value Requirement

The Jones appraisal did not determine the fair market value of Gladstone,

but rather its market value. A qualified appraisal must include "[t]he appraised

fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the

date (or expected date) of contribution". Sec. 1.170A-13(c)(3)(ii)(I), Income Tax

Regs. Section 1.170A-1(c)(2), Income Tax Regs., defines fair market value as

"the price at which the property would change hands between a willing buyer and

a willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of relevant facts." The definition of the term "fair market

**[\*33]** value" has been glossed judicially to incorporate certain attributes into the valuation test.[16] For example, the willing buyer and willing seller are both considered to be hypothetical rather than actual persons. <u>Bank One Corp. v. Commissioner</u>, 120 T.C. at 308-309. In addition, the fair market value of property reflects its highest and best use as of the date of its valuation. <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 218 (1990).

Mr. Jones defined market value as "the highest price estimate in terms of money which a property Will [sic] bring, if exposed for sale in the open market, allowing a reasonable time of [sic] Find [sic] a purchaser who buys with knowledge of all uses of which it is adapted, and for which it was capable of being used."

The mere fact that the wording of Mr. Jones' definition is different from that of the regulations, however, is not the end of the story.[17] Mr. Jones' definition of

---

[16]In <u>United States v. Woods</u>, 571 U.S. ___, ___, 134 S. Ct. 557, 566 (2013), the Supreme Court confirmed, in a unanimous opinion, that the issue of valuation rests on threshold legal determinations and is not limited to factual issues.

[17]In <u>Crimi v. Commissioner</u>, T.C. Memo. 2013-51, at \*62, we held that although "market value" is "an approximate value for fair market value" and although the "two terms are not necessarily synonymous depending on how they are defined", we were satisfied that "market value", as defined and used in the appraisal reports, was consistent with "fair market value" as used in the regulations. <u>Id.</u> (accepting an appraisal where the appraiser maintained at trial that

(continued...)

[*34] "market value" is different from "fair market value" as defined in the

regulations for the following reasons. First, Mr. Jones' definition of "market

value" does not require both the buyer and seller to have "reasonable knowledge

of relevant facts" as required by the regulation's definition of "fair market value".

Second, Mr. Jones' definition of "market value" does not encompass the notion of

a willing buyer and willing seller, and even omits reference to any seller. As the

Supreme Court has stated, "'[t]he willing buyer-willing seller test of fair market

value is nearly as old as the federal income, estate, and gifts taxes themselves'."

Kolom v. Commissioner, 454 U.S. 1011, 1013 (1981) (quoting United States v.

Cartwright, 411 U.S. 546, 551 (1973)); see also Gross v. Commissioner, 272 F.3d

333, 342 (6th Cir. 2001) (referring to the regulation's definition of "fair market

value" as the "'willing buyer/willing seller' standard"), aff'g T.C. Memo. 1999-

254.

For the foregoing reasons, the Jones appraisal determined the market value

of a hypothetical Gladstone, rather than the fair market value of the actual

---

[17](...continued)
the difference between "market value" as defined and used in the appraisal reports
and "fair market value" as used in the regulations is a mere "technical difference in
the prose").

[*35] Gladstone. Consequently, the Jones appraisal does not comply with section 1.170A-13(c)(3)(ii)(F), Income Tax Regs.

### d. Qualifications of the Appraiser Requirement

The Jones appraisal did not include Mr. Jones' qualifications. Under the regulations, a qualified appraisal must include "[t]he qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations". Sec. 1.170A-13(c)(3)(ii)(F), Income Tax Regs. The appraiser's qualifications constitute important information because they provide necessary context permitting the IRS to evaluate a claimed deduction. Hendrix v. United States, No. 2:09-cv-132, 2010 WL 2900391, at *5 (S.D. Ohio July 21, 2010) ("Without * * * the appraiser's education and background information, it would be difficult if not impossible to gauge the reliability of an appraisal that forms the foundation of a deduction."); Bruzewicz, 604 F. Supp. 2d at 1205 ("[The appraiser's qualifications] provide[] the IRS with some basis on which to determine whether the valuation in an appraisal report is competent and credible evidence to support what in some cases may be a very large tax saving."). Since the Jones appraisal does not include Mr. Jones' qualifications, it does not comply with section 1.170A-13(c)(3)(ii)(F), Income Tax Regs.

**[*36]**            e.            <u>Identifying Number of the Appraiser Requirement</u>

A qualified appraisal must include "[t]he name, address, and (if a taxpayer

identification number is otherwise required by section 6109[18] and the regulations

thereunder) the identifying number of the qualified appraiser".  Sec.

1.170A-13(c)(3)(ii)(E), Income Tax Regs.  This requirement is important because

it allows the IRS to readily ascertain the identity of the appraiser and whether he is

in good standing with the IRS.  <u>See, e.g.</u>, 31 U.S.C. sec. 330(c) (2006).[19]  Although

the Jones appraisal included Mr. Jones' name and address, it did not include his

identifying number.  Consequently, the Jones appraisal does not comply with

section 1.170A-13(c)(3)(ii)(E), Income Tax Regs.

---

[18]Sec. 6109(a)(1) provides that "[a]ny person required under the authority of this title to make a return, statement, or other document shall include in such return, statement, or other document such identifying number as may be prescribed for securing proper identification of such person."  Thus, an appraiser is required to provide his identifying number unless he is a nonresident alien who is not required to obtain a taxpayer identification number.  T.D. 8199, 1988-1 C.B. 99, 100.  Petitioners do not claim that Mr. Jones is a nonresident alien.

[19]Tit. 31 U.S.C. sec. 330(c) (2006) provides that "[a]fter notice and opportunity for a hearing to any appraiser, the Secretary may--(1) provide that appraisals by such appraiser shall not have any probative effect in any administrative proceeding before the Department of the Treasury or the Internal Revenue Service, and (2) bar such appraiser from presenting evidence or testimony in any such proceeding."

**[*37]**     f.     Date or Expected Date of Contribution Requirement

The Jones appraisal, like the Sanna appraisal, did not include the date or expected date of contribution as required by section 1.170A-13(c)(3)(ii)(C), Income Tax Regs.  See also supra section IV.A.1.b.

g.     Terms of the Agreement Requirement

The Jones appraisal, like the Sanna appraisal, did not include the terms of the agreement or understanding that relate to the use, sale, or other disposition of Gladstone as required by section 1.170A-13(c)(3)(ii)(D), Income Tax Regs.  See also supra section IV.A.1.c.

h.     Income Tax Purposes Statement Requirement

The Jones appraisal, like the Sanna appraisal, did not include a statement that the appraisal was prepared for income tax purposes, as required by section 1.170A-13(c)(3)(ii)(G), Income Tax Regs.  See also supra section IV.A.1.d.

i.     Timeliness of Appraisal Requirement

Finally, the Jones appraisal was performed on April 24, 2008, approximately five months before the donation of Gladstone on September 29, 2008.  Thus, the Jones appraisal was not conducted "no[] earlier than 60 days prior to the date of contribution of the appraised property" as required by section 1.170A-13(c)(3)(i)(A), Income Tax Regs.  See also supra section IV.A.1.a.

**[\*38]**  We now turn to examining whether petitioners' appraisers were qualified appraisers as required by section 170(f)(11).

B.    Qualified Appraiser

A qualified appraisal can be conducted only by a qualified appraiser.  Sec. 170(f)(11)(E)(i)(II).  A qualified appraiser is an individual who:  (1) "has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary"; (2) "regularly performs appraisals for which the individual receives compensation"; and (3) "meets such other requirements as may be prescribed by the Secretary in regulations or other guidance."  Sec. 170(f)(11)(E)(ii).

Section 170(f)(11)(E)(iii) further provides that "[a]n individual shall not be treated as a qualified appraiser with respect to any specific appraisal unless":  (1) "the individual demonstrates verifiable education and experience in valuing the type of property subject to the appraisal"; and (2) "the individual has not been prohibited from practicing before the Internal Revenue Service by the Secretary

[*39] under section 330(c) of title 31, United States Code, at any time during the

3-year period ending on the date of the appraisal."[20]

Under the regulations, a qualified appraiser is an individual who includes on

the appraisal summary a declaration that: (1) the individual either holds himself

out to the public as an appraiser or performs appraisals regularly; (2) the appraiser

is qualified to make appraisals of the type of property being valued; (3) the

appraiser is not excluded from qualifying as a qualified appraiser under section

1.170A-13(c)(5)(iv), Income Tax Regs.;[21] and (4) the appraiser understands that an

intentionally false or fraudulent overstatement of the value of the property

described in the qualified appraisal or appraisal summary may subject the

appraiser to a civil penalty under section 6701 for aiding and abetting an

understatement of tax liability. Sec. 1.170A-13(c)(5)(i), Income Tax Regs.

---

[20]Respondent makes no claim that either Mr. Sanna or Mr. Jones is
prohibited from practicing before the IRS pursuant to sec. 170(f)(11)(E)(iii)(II), so
we do not further address that issue.

[21]Pursuant to sec. 1.170A-13(c)(5)(iv), Income Tax Regs., an individual is
not a qualified appraiser if the individual is, inter alia, the donor, the donee, any
person employed by the donor or donee, or an appraiser who is regularly used by
the donor or donee and who does not perform most of his or her appraisals for
other persons. Respondent makes no claim regarding whether Mr. Sanna or Mr.
Jones is an ineligible appraiser pursuant to sec. 1.170-A13(c)(5)(iv), Income Tax
Regs., so we do not further address that issue.

**[\*40]**      1.      <u>Mr. Sanna</u>

Mr. Sanna's qualifications were included as part of his appraisal report.  He holds a designation from the Appraisal Institute, a recognized professional appraiser organization.  In addition, it is evident from his work experience that he regularly performs appraisals for compensation.  However, we have held that section 1.170A-13(c)(5)(i), Income Tax Regs., is a reporting requirement and that the plain language of the regulations states that in order to be a qualified appraiser, an individual must include on the appraisal summary a declaration that he holds himself out as an appraiser, that he is so qualified, that he is not an ineligible individual, and that he understands the consequences of a fraudulent overvaluation.  See <u>Friedberg v. Commissioner</u>, T.C. Memo. 2013-224, at \*27.  Because Mr. Sanna did not make such a declaration on petitioners' appraisal summary, he is not a qualified appraiser under the regulations.

2.      <u>Mr. Jones</u>

Mr. Jones' qualifications were not included in his appraisal report.  Although petitioners argue that Mr. Jones' curriculum vitae was provided to the IRS during their audit, they did not produce his curriculum vitae or any other evidence of his qualifications.  Furthermore, Mr. Jones also did not make a declaration on petitioners' appraisal summary that he holds himself out as an

[*41] appraiser, that he is so qualified, that he is not an ineligible individual, and that he understands the consequences of a fraudulent overvaluation, as required by section 1.170A-13(c)(5)(i), Income Tax Regs. Thus, petitioners have failed to establish that Mr. Jones is a qualified appraiser as defined by section 170(f)(11)(E)(ii).

We now turn to whether petitioners' appraisal summary satisfies the appraisal summary regulation requirements.

C.     Appraisal Summary

Under the regulations, a fully completed appraisal summary must be attached to the tax return on which the deduction for a contribution is first claimed. Sec. 1.170A-13 (c)(2)(i)(B), Income Tax Regs. The appraisal summary, which differs from a qualified appraisal, must comply with the requirements set forth in section 1.170A-13(c)(4), Income Tax Regs.

An appraisal summary is a summary of a qualified appraisal that is: (1) "made on the form prescribed by the Internal Revenue Service"; (2) "signed and dated * * * by the donee"; (3) "signed and dated by the qualified appraiser * * * who prepared the qualified appraisal"; and (4) includes the following information:

(A) The name and taxpayer identification number of the donor * * *;

**[\*42]**  (B) A description of the property * * *;

(C) In the case of tangible property, a brief summary of the overall physical condition of the property at the time of the contribution;

(D) The manner of acquisition * * * and the date of acquisition of the property by the donor * * *;

(E) The cost or other basis of the property * * *;

(F) The name, address, and taxpayer identification number of the donee;

(G) The date the donee received the property;

(H) * * * a statement explaining * * * the amount of any consideration received from the donee for the contribution;

(I) The name, address, and * * * the identifying number of the qualified appraiser who signs the appraisal summary * * *;

(J) The appraised fair market value of the property on the date of contribution;

(K) The declaration by the appraiser * * * [stating that he is an appraiser, with sufficient qualifications to make this appraisal, and not an individual who is ineligible to make the appraisal];

(L) A declaration by the appraiser stating that * * * [the fee charged was not of a prohibited type and that the appraiser has not been barred from presenting appraisals to the IRS under 31 U.S.C. section 330(c)]; and

(M) Such other information as may be specified by the form.

Sec. 1.170A-13(c)(4)(i) and (ii), Income Tax Regs.  The IRS has prescribed Form

**[*43]** 8283 to be used as the appraisal summary. <u>Jorgenson v. Commissioner</u>, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450 (2000).

Petitioners' appraisal summary omits at least four categories of information. In addition, petitioners provided false information in at least four instances. Collectively, petitioners' appraisal summary suffers from at least eight deficiencies.

       1.     <u>False Information Provided</u>

       a.     <u>Cost or Other Basis Requirement</u>

An appraisal summary must include "[t]he cost or other basis of the property adjusted as provided by section 1016".[22] Sec. 1.170A-13(c)(4)(ii)(E), Income Tax Regs. Petitioners misrepresented both Gladstone's cost basis and its date of acquisition. On their Form 8283 petitioners reported that Gladstone was acquired in June 2000 and that their basis was $1,200,000. The record, however, shows that petitioners purchased both Pingree and Gladstone for $353,000 in 1983.

Establishing the taxpayer's proper basis in a contributed property is essential because the basis affects the amount of the deduction allowed. Pursuant to section 170(e)(1)(A), the deduction amount for a charitable contribution of

---

[22]Sec. 1016 pertains to adjustments to basis for exhaustion, wear and tear, obsolescence, amortization, depletion, etc.

[*44] property must be reduced by the amount of gain which would not have been long-term capital gain, had the property been sold at its fair market value.[23] Therefore, a taxpayer who fails to establish his basis in contributed property is not entitled to a charitable contribution deduction. See Riether v. United States, 919 F. Supp. 2d 1140, 1153 (D.N.M. 2012). Petitioners, by reporting a false basis for Gladstone on their appraisal summary, failed to comply with section 1.170A-13(c)(4)(ii)(E), Income Tax Regs.

b.     Condition of Tangible Property Requirement

In the case of tangible property, an appraisal summary must include "a brief summary of the overall physical condition of the property at the time of the contribution". Sec. 1.170A-13(c)(4)(ii)(C), Income Tax Regs.

On their Form 8283 petitioners reported the physical condition of Gladstone as "good". We have held that a description of the physical condition of property generally as merely "new", "used", "good", "fair", "dismantled", or "discard" is inadequate to satisfy the physical condition requirement of the regulations because

_____

[23]Sec. 1221(a)(2) provides that a "capital asset" does not include "real property used in * * * [the taxpayer's] trade or business." BSA rented out Gladstone for profit. Therefore Gladstone is "real property used in * * * [a] trade or business", and not a capital asset. Thus, pursuant to sec. 170(e)(1)(A), the deductible amount for its contribution must be reduced by the amount of ordinary gain which would have been recognized had Gladstone been sold at its fair market value.

[*45] "[w]ithout a more detailed description the appraiser's approach and methodology cannot be evaluated." O'Connor v. Commissioner, T.C. Memo. 2001-90, 81 T.C.M. (CCH) 1509, 1515 (2001); see also Friedman v. Commissioner, T.C. Memo. 2010-45, 99 T.C.M. (CCH) 1175, 1177 (2010) (holding that generic descriptions such as "good working condition" or "operational, clean and in good saleable condition" are inadequate because "[w]ithout a more detailed description[,] the appraiser's approach and methodology cannot be evaluated").

Moreover, not only was petitioners' description of Gladstone's physical condition inadequate; it was false. In reality, Gladstone's physical condition was not "good" but rather very poor. According to Mr. Ackerman, Gladstone was in "pretty rough" condition and few of its apartment units were rent ready. In summary, by reporting a false and inadequate description of Gladstone's physical condition, petitioners failed to comply with section 1.170A-13(c)(4)(ii)(C), Income Tax Regs.

c.    Appraised Fair Market Value Requirement

An appraisal summary must include "[t]he appraised fair market value of the property on the date of contribution". Sec. 1.170A-13(c)(4)(ii)(J), Income Tax Regs. On their Form 8283, petitioners reported $499,000 as the appraised fair

[*46] market value of Gladstone. This figure is supported by neither the Sanna appraisal nor the Jones appraisal, nor by anything else in the record.

The Sanna appraisal only estimated the annual income potential of Gladstone and did not provide an appraisal of its fair market value. The Jones appraisal provides an appraisal of a fully renovated Gladstone at $664,062.50. In fact, the $499,000 figure smacks of manipulation--petitioners likely chose the $499,000 figure to avoid section 170(f)(11)(D), which requires that a donor attach a qualified appraisal to his return for contributions valued at over $500,000. Accordingly, petitioners failed to comply with section 1.170A-13(c)(4)(ii)(J), Income Tax Regs.

### 2. Omitted Information

#### a. Taxpayer Identification Number of Donee Requirement

An appraisal summary must include "[t]he name, address, and taxpayer identification number of the donee". Sec. 1.170A-13(c)(4)(ii)(F), Income Tax Regs. The taxpayer identification number of the donee is important because it allows the IRS to readily confirm whether the donee organization is a qualified donee pursuant to section 170(c). Thus, provision of the taxpayer identification number is central to the purpose of the charitable contribution reporting regulations, which is to provide the IRS with sufficient information to evaluate the

[*47] claimed deduction.  Petitioners' Form 8283 included Volunteers of America's name and address but did not include its taxpayer identification number, which Volunteers of America had provided to petitioners on its donation receipt for Gladstone.  Consequently, petitioners failed to comply with section 1.170A-13(c)(4)(ii)(F), Income Tax Regs.

### b.    Declarations of Appraiser Requirement

An appraisal summary must include "[t]he declaration by the appraiser described in paragraph (c)(5)(i) of this section".  Sec. 1.170A-13(c)(4)(ii)(K), Income Tax Regs.  An appraisal summary must further include "[a] declaration by the appraiser stating that--[t]he fee charged for the appraisal is not of a type prohibited by paragraph (c)(6) of this section; and [a]ppraisals prepared by the appraiser are not being disregarded pursuant to 31 U.S.C. [sec.] 330(c)".[24]  Sec. 1.170A-13(c)(4)(ii)(L)(1) and (2), Income Tax Regs.  As further explained below, these declaration requirements promote compliance with the qualified appraiser regulations and allow the IRS to readily ascertain that the appraisal was performed by a qualified appraiser.

The appraiser declaration set forth in section 1.170A-13(c)(4)(ii)(K), Income Tax Regs., ensures that the appraiser is aware of and swears compliance to

---

[24]See supra notes 14 and 18.

[*48] certain limitations on who can be a qualified appraiser (i.e., that the individual is or holds himself out as an appraiser, is qualified to appraise the contributed property, is not a party to the transaction or a related party, and understands that a fraudulent overstatement can result in civil or criminal penalties). See supra section IV.B.

The appraiser declaration set forth in section 1.170A-13(c)(4)(ii)(L)(1), Income Tax Regs., ensures that the appraiser is both aware of and swears compliance with certain limitations designed the ensure the objectivity of the appraiser.

Finally, the appraiser declaration set forth in section 1.170A-13(c)(4)(ii)(L)(2), Income Tax Regs., is important because it requires the appraiser to swear that he is in good standing with the IRS.

Petitioners' Form 8283 does not include the requisite declarations by Mr. Sanna, Mr. Jones, or any other appraiser. Consequently, petitioners failed to comply with section 1.170A-13(c)(4)(ii)(K) and (L), Income Tax Regs.

<blockquote>c. <u>Name, Address, and Identifying Number of Appraiser Requirement</u></blockquote>

An appraisal summary must include "[t]he name, address, and * * * the identifying number of the qualified appraiser who signs the appraisal summary."

[*49] Sec. 1.170A-13(c)(4)(ii)(I), Income Tax Regs. As explained supra section IV.A.2.e., this information allows the IRS to readily ascertain the identity of the appraiser and whether he is in good standing with the IRS. Petitioners' Form 8283 did not include the name, address, or identification number of Mr. Sanna, Mr. Jones, nor any other appraiser. Consequently, petitioners failed to comply with section 1.170A-13(c)(4)(ii)(I), Income Tax Regs.

### d. Statement of Consideration Received Requirement

An appraisal summary must include "a statement explaining * * * the amount of any consideration received from the donee for the contribution". Sec. 1.170A-13(c)(4)(ii)(H), Income Tax Regs. The Supreme Court has held that "[t]he sine qua non of a charitable contribution is a transfer of money or property without adequate consideration." United States v. Am. Bar Endowment, 477 U.S. 105, 118 (1986).

Although Volunteers of America provided Dr. Alli with a donation receipt which stated that he did not receive any consideration for the contribution of Gladstone,[25] petitioners' Form 8283 did not include a consideration statement as required by section 1.170A-13(c)(4)(ii)(H), Income Tax Regs. The purpose of the charitable contribution reporting requirements is to enable the IRS to evaluate the

---

[25]The donation receipt was not included as part of petitioners' tax return.

[*50] claimed deduction.  Smith v. Commissioner, 94 T.C.M. (CCH) at 586.  In order to evaluate the claimed deduction, the IRS must be apprised of whether the donor received any consideration from the donee.  Thus, regardless of whether a donor received any consideration, a taxpayer who does not include a consideration statement in his appraisal summary or elsewhere on his return is not entitled to a charitable contribution deduction.  Cf. Friedman v. Commissioner, 99 T.C.M. (CCH) at 1178 (holding that a donor who fails to obtain a contemporaneous written acknowledgment of a donation as required by section 170(f)(8)[26] is not entitled to a deduction, regardless of whether any consideration had been received, because Congress intended for charitable organizations to inform their donors that the deduction is limited to the amount by which the contribution exceeds any consideration provided by the charity).  Because petitioners' Form 8283 did not include a consideration statement, petitioners failed to comply with section 1.170A-13(c)(4)(ii)(H), Income Tax Regs.

---

[26]Sec. 170(f)(8) provides that "[n]o deduction shall be allowed * * * for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization" that includes, inter alia, information regarding "[w]hether the donee organization provided any goods or services in consideration, in whole or in part, for any property [contributed]".

[*51] Having concluded that petitioners failed to comply with many of the

qualified appraisal and other documentation requirements of section 170(f)(11)(G)

so that their claimed charitable deduction would otherwise be disallowed, we now

address whether petitioners' noncompliance should be excused under the

substantial compliance doctrine.

V.    Substantial Compliance Doctrine

Some courts have held that strict compliance with the qualified appraisal

and other documentation requirements is not necessary if the taxpayer

substantially complies with the reporting regulations.  We did not find any

authority from the Court of Appeals for the Sixth Circuit regarding whether the

substantial compliance doctrine applies in the context of the qualified appraisal

regulations.[27]  In Hewitt v. Commissioner, 109 T.C. at 265, we explained that the

---

[27]The Court of Appeals for the Sixth Circuit, however, has addressed the substantial compliance doctrine in the context of other tax provisions.  In Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 377 F.3d 592, 596 (6th Cir. 2004), aff'd, 545 U.S. 308 (2005), the court held that substantial compliance applies in the tax sale context because sec. 6339(b) includes a "'substantially in accordance with the provisions of law'" qualification.  In Kales v. United States, 115 F.2d 497, 502 (6th Cir. 1940), aff'd, 314 U.S. 186 (1941), the court held that the taxpayer substantially complied with the applicable statute of limitations for refund actions where the taxpayer filed an informal claim before the period of limitations had expired and the later filed formal claim was "but a perfection of the informal claim".  In contrast, in United States v. Hindenlang (In re Hindenlang), 164 F.3d 1029 (6th Cir. 1999), the court declined to apply the substantial

(continued...)

[*52] key question in substantial-compliance cases is whether "the taxpayers had provided most of the information required, and the single defect in furnishing everything required was not significant."

In determining whether a taxpayer has substantially complied with the charitable contribution reporting regulations, we return to the purpose of the regulations--i.e., to provide the IRS with sufficient information to evaluate the claimed deduction and deal more effectively with the prevalent use of overvaluations. Smith v. Commissioner, 94 T.C.M. (CCH) at 586.

Some courts have found that strict compliance can be excused where the taxpayer has supplied nearly all of the required information (in either the appraisal report or the appraisal summary) and all substantive requirements have been met. In Scheidelman v. Commissioner, 682 F.3d 189, 198-199 (2d Cir. 2012), vacating and remanding T.C. Memo. 2010-151, the Court of Appeals for the Second Circuit held that the taxpayers substantially complied with the qualified appraisal and other documentation requirements where the taxpayers attached two appraisal

_____

[27](...continued)
compliance doctrine and held that a return was not a valid return where it was filed after an assessment for the tax had already been made. Similarly, in Addison Int'l, Inc. v. Commissioner, 887 F.2d 660, 664-665 (6th Cir. 1989), aff'g 90 T.C. 1207 (1988), the court held that a late payment does not substantially comply with regulations that require such payments to be made within 60 days after the close of a domestic international sales corporation's (DISC) tax year.

**[\*53]** summaries to their return, neither of which individually contained all the requisite information, but which contained all the requisite information when combined. The court noted that reporting the required information on two forms rather than gathered in a single form was "the most technical of deficiencies" which should be excused on the basis of substantial compliance. Id. Scheidelman, however, is distinguishable from this case. The taxpayers in Scheidelman, unlike petitioners, submitted an appraisal that satisfied the qualified appraisal requirements. Id. at 199. In addition, unlike the taxpayers in Scheidelman, petitioners did not submit appraisal summaries with all the requisite information but rather submitted an appraisal summary with missing and false information.

In Kaufman v. Shulman, 687 F.3d 21, 29 (1st Cir. 2012), vacating in part and remanding in part, 136 T.C. 294 (2011) and 134 T.C. 182 (2010), the Court of Appeals for the First Circuit held that the taxpayers substantially complied with the qualified appraisal and other documentation requirements where the taxpayers did not report the manner or date of acquisition nor the cost or other basis of a contributed facade easement. The court explained that because the taxpayers had created the facade easement, there was no manner or date of acquisition nor cost or other basis to report. Id. The court further explained that while the taxpayers arguably should have written "none" or "not applicable" in the spaces on their

**[\*54]** Form 8283, these defects were in no way prejudicial to the IRS.  Id.

Kaufman is likewise readily distinguishable from this case.  Unlike the taxpayers in Kaufman who created the contributed property by transferring an easement, petitioners purchased Gladstone from HUD in 1983 and paid $353,000 for both Pingree and Gladstone.  Petitioners did not omit this information but rather reported falsely that they had purchased Gladstone in June 2000 and that their basis in Gladstone was $1,200,000.

Moreover, the substantial compliance doctrine should not be liberally applied.  Mohamed v. Commissioner, T.C. Memo. 2012-152, 103 T.C.M. (CCH) 1814, 1820-1821 (2012) ("[T]he problems of misvalued property are so great that Congress was quite specific about what the charitably inclined have to do to defend their deductions[.]"); see also Prussner v. United States, 896 F.2d 218, 224 (7th Cir. 1990) (the substantial compliance doctrine "should be interpreted narrowly * * * [and] should not be allowed to spread beyond cases in which the taxpayer had a good excuse (though not a legal justification) for failing to comply with either an unimportant requirement or one unclearly or confusingly stated in the regulations or the statute"); Bruzewicz, 604 F. Supp. 2d at 1203 (applying Prussner's narrow interpretation of the substantial compliance doctrine in the context of the section 170 charitable contribution reporting requirements).

[*55] As further explained below, courts have routinely declined to apply the substantial compliance doctrine where: (1) substantive requirements set forth in the qualified appraisal regulations are not met or (2) entire categories of required information are omitted.

A.      Substantive Requirement Not Met

Courts have found that strict compliance cannot be excused where a substantive requirement of the qualified appraisal regulations is not satisfied. See, e.g., Hewitt v. Commissioner, 109 T.C. at 260, 264 (holding that failing to provide an appraisal summary does not constitute substantial compliance); Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, at *12-*13,*14-*15 (holding that obtaining an appraisal of the wrong property--i.e., a entity's assets rather than the ownership interest in the entity--does not constitute substantial compliance); Jorgenson v. Commissioner, 79 T.C.M. (CCH) at 1448, 1451 (holding that an appraisal conducted after the return was filed does not constitute substantial compliance); D'Arcangelo v. Commissioner, T.C. Memo. 1994-572, 68 T.C.M. (CCH) 1223, 1230 (1994) (holding that obtaining an appraisal from a nonqualified appraiser does not constitute substantial compliance).

The Sanna appraisal fails at least two substantive requirements for a qualified appraisal. First, the Sanna appraisal was performed in 1999, far outside

[*56] the 60-day period before the contribution required by the regulations. Although an appraisal that is slightly premature may substantially comply with the regulations, see, e.g., Consol. Investors Grp. v. Commissioner, T.C. Memo. 2009-290, 98 T.C.M. (CCH) 601, 614 (2009) (holding that substantial compliance existed where an appraisal was three months premature), an appraisal does not substantially comply with the regulations when the purpose of the appraisal requirements--i.e., ensuring that the correct values of donated property are reported--would be undermined, see, e.g., Jorgenson v. Commissioner, 79 T.C.M. (CCH) at 1451 (holding that an appraisal conducted after the return was filed does not substantially comply with the regulations). The Sanna appraisal was conducted nearly a decade before the contribution of Gladstone, making it virtually impossible for the appraisal to accurately reflect the true value of Gladstone on the contribution date. Second, the Sanna appraisal was not a fair market value appraisal of Gladstone, a deficiency that goes to the heart of the qualified appraisal requirements. As a result of these substantive deficiencies, the Sanna appraisal does not substantially comply with the regulations.

The Jones appraisal also fails at least two substantive requirements. As explained earlier, petitioners have failed to establish that Mr. Jones is qualified to appraise Gladstone. We have held that obtaining an appraisal from a nonqualified

[*57] appraiser does not constitute substantial compliance. D'Arcangelo v.

Commissioner, 68 T.C.M. (CCH) at 1230.  More importantly, however, the Jones

appraisal appraised the wrong asset--i.e., a hypothetical fully renovated Gladstone,

rather than Gladstone as contributed.  We have held that an appraisal of the

incorrect asset cannot substantially comply with the qualified appraisal

requirements because it prevents the Commissioner from properly understanding

and monitoring the claimed contribution.  Estate of Evenchik v. Commissioner, at

*12-*13.  In Estate of Evenchik, the taxpayers contributed their interest in a

corporation but obtained an appraisal of the corporation's assets.  Id. at *14-*15.

We held that such an error "misrepresents the actual property interest

contributed"and "goes to the essence of the information required".  Id. at *13-*14.

Similarly, in Smith v. Commissioner, 94 T.C.M. (CCH) at 585, we held that

substantial compliance did not exist where the taxpayer contributed an interest in a

partnership but obtained an appraisal of the partnership's assets.  We explained

that "although the values of the [partnership] interests were substantially

dependent upon the [asset] values", a separate appraisal report for the partnership

interests was necessary.  Id.  In this case, although a relationship does exist

between the prerenovation and postrenovation values of Gladstone, because of

Gladstone's dilapidated state this relationship is far less direct than the

[*58] relationship of the properties in <u>Estate of Evenchik</u> and <u>Smith</u>. Therefore, as a result of these substantive deficiencies, the Jones appraisal does not substantially comply with the regulations.

B.     <u>Entire Categories of Required Information Omitted</u>

Courts have also found that strict compliance cannot be excused where the taxpayer fails to provide entire categories of mandated information. <u>Hendrix</u>, 2010 WL 2900391, at \*6 ("The substantial compliance doctrine is not a substitute for missing entire categories of content; rather, it is at most a means of accepting a nearly complete effort that has simply fallen short in regard to minor procedural errors or relatively unimportant clerical oversights."); <u>see also</u> <u>Estate of Evenchik v. Commissioner</u>, at \*9-\*10 (holding that appraisals which did not provide a description, the contribution date, the terms of agreement relating to the disposition of the contributed property, an income tax purpose statement, or the fair market value as of the contribution date fell "woefully short" of the charitable contribution reporting requirements); <u>Lord v. Commissioner</u>, T.C. Memo. 2010-196, 100 T.C.M. (CCH) 201, 202 (2010) (holding that omitting the contribution date, the appraisal performance date, or the appraised fair market value as of the contribution date does not constitute substantial compliance); <u>Friedman v. Commissioner</u>, 99 T.C.M. (CCH) at 1177 (holding that omitting the

[*59] manner of acquisition and the cost or other adjusted basis in the donated property does not constitute substantial compliance); Smith v. Commissioner, 94 T.C.M. (CCH) at 585 (holding that omitting the income tax purposes statement, the contribution date, and a disclosure of restrictions on use or disposition does not constitute substantial compliance).

Likewise, the Sanna appraisal, the Jones appraisal, and petitioners' Form 8283 collectively lack entire categories of information--i.e., a consideration statement from Volunteers of America,[28] the terms regarding the disposition of Gladstone, an income tax purposes statement, appraiser declarations, and the taxpayer identification numbers of the appraiser and Volunteers of America. In addition, petitioners' Form 8283 contains entire categories of false information-- i.e., the contribution date of Gladstone, petitioners' basis in Gladstone, the appraised fair market value of Gladstone, and Gladstone's physical condition. For

---

[28]Although Volunteers of America provided Dr. Alli with a donation receipt which stated that Dr. Alli "received no goods or services as a result of this donation" as required by sec. 170(f)(8), the donation receipt was not made a part of petitioners' appraisal summary nor was it otherwise included in petitioners' return.

**[\*60]** these reasons, petitioners did not substantially comply with the qualified

appraisal and reporting regulations.[29]

## VI.    Reasonable Cause

Even if a taxpayer does not strictly or substantially comply with the

qualified appraisal and other documentation requirements, a charitable

contribution deduction will not be denied if the failure to meet those requirements

is due to "reasonable cause and not to willful neglect".  Sec. 170(f)(11)(A)(ii)(II).

The burden of proving reasonable cause is on the taxpayer.  Rule 142(a).

In Crimi v. Commissioner, T.C. Memo. 2013-51, we interpreted the section

170(f)(11)(A)(ii)(II) reasonable cause standard by looking to the reasonable cause

standard of other Code provisions.  "Reasonable cause requires that the taxpayer

have exercised ordinary business care and prudence as to the challenged item * * *

---

[29]At least one court has held that the substantial compliance doctrine does not apply where the taxpayer does not rely on the offered appraisal because "the purpose of the qualified appraisal is to present an understandable rationale for the claimed deduction * * * [and] to 'show the work' so as to obviate the injection of unfounded guessing into the tax scheme."  Hendrix v. United States, No. 2:09-cv-132, 2010 WL 2900391, at *6 (S.D. Ohio July 21, 2010).  In Hendrix, the court held that this purpose was undermined where a taxpayer claimed a deduction of $287,400 but offered an appraisal of the contribution at $520,000, even though reasonable explanations for the discrepancy might exist.  Id.  For the same reason, the substantial compliance doctrine does not apply in this case.  By claiming a deduction of $499,000, but offering an appraisal of Gladstone at $664,062.50, petitioners undermined the very purpose of the qualified appraisal requirement.

**[*61]** Thus, the inquiry is inherently a fact-intensive one, and facts and circumstances must be judged on a case-by-case basis." Id. at *99-*102 (citing United States v. Boyle, 469 U.S. 241 (1985)).

A taxpayer's reliance on the advice of a professional, such as a certified public accountant (C.P.A.), would constitute reasonable cause and good faith if the taxpayer proves by a preponderance of the evidence that: "(1) the taxpayer reasonably believed the professional was a competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the advising professional; [and] (3) the taxpayer actually relied in good faith on the professional's advice." Id. at *99; see also Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

In Crimi we held that the taxpayer reasonably relied on his CPA's advice that the appraisal was qualified where the taxpayer had relied on his C.P.A. as a competent tax and accounting adviser for over two decades, provided his C.P.A. with all documents, and regularly apprised his C.P.A. of the status of the contribution transaction. Crimi v. Commissioner, at *100-*102; see also Esgar Corp. v. Commissioner, T.C. Memo. 2012-35, 103 T.C.M. (CCH) 1185, 1189, 1201 (2012) (holding that reasonable cause existed where the taxpayers relied on

[*62] the conclusion of their C.P.A., with whom they had worked for over 25 years, that the appraiser "'took a reasonable approach to determine the value'").

Petitioners argue that reasonable cause exists because they relied on Mr. Siegal, the paid preparer for their 2008 return, regarding the charitable contribution deduction. Petitioners claim that Mr. Siegal is a C.P.A. and an attorney, and further claim that he has prepared their returns for over 30 years. However, petitioners have produced no reliable evidence of Mr. Siegal's qualifications, no reliable evidence that they provided Mr. Siegal with complete information, no reliable evidence of the content of Mr. Siegal's advice, and no reliable evidence that they reasonably relied on that advice.[30]

Petitioners further argue that reasonable cause exists because they relied on the appraisals by Mr. Sanna and Mr. Jones. However, petitioners have produced no evidence that either Mr. Sanna or Mr. Jones is a "professional" as the term is defined in Crimi--i.e., a competent tax adviser with sufficient expertise to justify reliance. Furthermore, petitioners did not rely on either Mr. Sanna or Mr. Jones in claiming a $499,000 deduction, a figure wholly unsupported by the record.

---

[30]We further note that petitioners did not call Mr. Siegal as a witness, which gives rise to an adverse inference that had he been called, his testimony would not have supported petitioners' contentions. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).

**[\*63]** Accordingly, petitioners do not meet their burden of establishing reasonable cause based on their alleged reliance upon professional advice.

Any arguments not discussed in this opinion are irrelevant, moot, or lacking in merit.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.